**SIERRA CLUB, Petitioner,**

v.

**Lee M. THOMAS, Administrator, Environmental Protection Agency, et al., Respondent,**

**American Mining Congress, et al., National Coal Association, Intervenors.**

No. 86–1134.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1987.

Decided Sept. 8, 1987.

Petition for Review of an Order of the U.S. Environmental Protection Agency.

Joseph J. Brecher, for petitioner. Howard Fox, also entered an appearance for petitioner.

1. 49 Fed.Reg. 43,211 (1984).

Stephen L. Samuels, Atty., Dept. of Justice with whom Gregory Foote, Atty., U.S. E.P.A., was on brief, for respondents.

Michael B. Barr and Kerry A. Walsh Skelly, were on brief, for intervenor, Nat. Coal Assn. Charles D. Ossola, also entered an appearance for intervenor.

Roberta L. Halladay and Robert T. Connery, were on brief, for intervenor, American Min. Congress, et al. J. Peter Luedtke and Larry A. Boggs, also entered appearances for intervenors.

Before RUTH B. GINSBURG, STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

On October 24, 1984, the Environmental Protection Agency (EPA) issued a proposal for rulemaking[1] concerning whether to place strip mines on its list of pollutant sources subject to fugitive emissions regulation under the "prevention of significant deterioration" (PSD) program of the Clean Air Act (Act).[2] Contending that EPA has unreasonably delayed in concluding this rulemaking, the petitioner, Sierra Club, requests that we enjoin EPA to reach a final decision within ninety days. We conclude that EPA has not engaged in unreasonable delay and therefore deny the request for relief.

I. BACKGROUND

This case requires us to revisit EPA's regulation of fugitive emissions, a subject previously addressed in *Alabama Power Co. v. Costle*, 636 F.2d 323, 368–70 (D.C. Cir.1979) and *Sierra Club v. Gorsuch*, 715 F.2d 653 (D.C.Cir.1983). Because those opinions provide an extensive summary of the statutory and regulatory history of fugitive emission regulation, we retrace only its broad outlines here.

2. Pub.L. 95–95, Title I, § 127(a), 91 Stat. 685, 731 (codified as amended at 42 U.S.C. §§ 7470–79 (1982)).

The original focus of the Act was on bringing all regions of the country into compliance with the minimum air quality standards it established. In order to ensure that this air quality floor did not in effect become a ceiling, Congress in 1977 amended the Act by establishing the PSD program (Part C of the Act, *see supra* note 2), which applies to those regions whose air quality exceeds the minimum standards. The PSD program governs the construction of "major emitting facilities," which are defined in section 169(1) of the Act as stationary sources of air pollutants that emit or have the potential to emit more than a specified tonnage per year, depending upon the type of source involved.[3]

"[T]he Act distinguishes between two types of emissions: 'point source' emissions, such as those from a chimney; and 'fugitive' emissions, which are not emitted from a single point."[4] In *Alabama Power*, we reviewed PCD regulations to determine whether EPA properly charged emissions from "fugitive sources" against the maximum established in section 169(1). We held that, on account of the rulemaking requirement imposed by section 302(j) of the Act[5] (which defines "major emitting facility" for the entire Act), "the agency could only consider fugitive emissions in such [calculations] when done pursuant to a rule."[6] We therefore vacated the PSD regulations, which were based upon the erroneous presumption that "the statute of its own momentum subjects major sources of fugitive emissions to PSD" review.[7]

Upon remand, in 1979 EPA issued a rulemaking proposal to include twenty-seven categories of fugitive emission sources in its "major emitting facility" calculations.[8] The listed sources did not include strip mines, but the proposal explained that EPA "over the next several months will consider the need for additional source types to be added to the list ... including strip mines."[9] In commenting on the proposal, Sierra Club suggested that strip mines be added to the list.[10] The final PSD regulations issued in August 1980, however, still omitted strip mines.[11] Sierra Club moved for reconsideration on that ground. In March 1981, EPA denied reconsideration, stating that it had not conclusively excluded strip mines as a source of fugitive emissions, and adding that it was "actively gathering information ... [to] put it in a better position than it is now to reach a final decision on strip mines."[12]

Several industry groups and the Sierra Club each petitioned this court to review EPA's 1980 regulations.[13] In February 1982, however, the industry groups and EPA entered into a settlement, under which EPA agreed to propose to delete the twenty-seven fugitive emission sources from the "major emitting facility" calculations. On August 25, 1983, EPA issued such a proposed rulemaking,[14] and also proposed various interpretations of section 302(j) not relevant to this case.

The next day, this court decided *Sierra Club v. Gorsuch*, a petition to review EPA's decision not to include strip mines in the 1980 regulations.[15] Although we found

3. 42 U.S.C. § 7479(1).

4. *Sierra Club v. Gorsuch*, 715 F.2d at 655 (footnote omitted).

5. 42 U.S.C. § 7602(j).

6. *Sierra Club v. Gorsuch*, 715 F.2d at 655.

7. *Alabama Power*, 636 F.2d at 369.

8. 51 Fed.Reg. 51,924 (1979).

9. *Id.* at 51,931.

10. *See Sierra Club v. Gorsuch*, 715 F.2d at 655 & n. 15.

11. 52 Fed.Reg. 52,676 (1980).

12. *Sierra Club v. Gorsuch*, 715 F.2d at 656.

13. The appeals by the industry groups were consolidated for appeal as *Chemical Manufacturers Assoc. v. EPA*, No. 79–1112 (D.C.Cir.).

14. 48 Fed.Reg. 38,742 (1983).

15. The court clearly stated that "[w]e are not deciding whether regulations covering strip mines would have been required in the absence of an ongoing proceeding." 715 F.2d at 657. Instead, the issue before us was "whether the omission of strip mines from the August 7, 1980 list was arbitrary and capricious" which, as we explained, was distinct from the questions, which we did not address, of "whether the Act requires EPA to regulate strip mines" and of

this omission "troubling", we held that "at this point [the EPA] has acted [neither] arbitrarily nor capriciously."[16] We therefore remanded the record to EPA, while retaining jurisdiction of the appeal, for the agency "to reconsider whether strip mines should be added to the list of regulated sources."[17] In closing, we expressed our desire that EPA "act on this remand in an appropriately expeditious manner."[18]

On December 16, 1983, Sierra Club petitioned the court for an order compelling EPA to complete its reconsideration of the strip mine question by January 6, 1984. On January 31, 1984, EPA informed the court that it would be unable to issue a final rule on that matter for another six to twelve months, due to the agency's on-going consideration of its August 25, 1983 rulemaking proposal. On February 24, 1984, Sierra Club petitioned the court for an order requiring EPA within thirty days to propose including strip mines on the list of fugitive emission sources. On April 20, 1984, we denied Sierra Club's two petitions but did order EPA to decide within six months whether to issue a proposal to list strip mines.

On October 26, 1984, EPA concluded its August 25, 1983 proposed rulemaking by re-promulgating as a final rule its previous list of twenty-seven fugitive emission sources, which did not include strip mines.[19] In the final rule, EPA also reaffirmed its 1980 interpretation of section 302(j):

Congress intended that EPA make only two determinations before it required fugitive emissions to be included in threshold applicability determinations for

sources in a particular category: (1) That the sources have the potential to degrade air quality significantly and (2) that no unreasonable socioeconomic impacts relative to the benefits would result from subjecting the sources to the relevant PSD or nonattainment programs.[20]

On the same day, EPA issued a separate rulemaking proposal to add strip mines to the fugitive emission source list.[21] In soliciting comment on the anticipated socioeconomic impact of such listing, EPA expected "weighty objections" from the mining industry.[22] EPA also announced that it was preparing a Regulatory Impact Analysis (RIA) on the socioeconomic effects, and stated that it would reopen the comment period after release of the RIA.[23] Accordingly, on November 21, 1984 we *sua sponte* terminated the docket in *Sierra Club v. Gorsuch.*

EPA conducted public hearings on the strip mine proposal in December 1984. In February, 1986, EPA released its RIA on the socioeconomic impact of listing strip mines and, as it had promised in its original proposal, reopened the comment period (for sixty days). EPA also held a public hearing in April, 1986, and at the request of both industry and environmental groups, extended the reopened comment period until June 30, 1986.[24] The rulemaking record indicates that EPA received approximately 200 written submissions during the original and reopened comments periods, and that its consideration of the October 24, 1984 proposal to list strip mines continues.[25]

---

whether "the delay in EPA deliberations on strip mines [was] equivalent to a decision not to regulate[,] and subject to review as such." *Id.* at 657–58 & n. 29.

16. 715 F.2d at 661.

17. *Id.*

18. *Id.* In a footnote to the passage quoted above, we stated that "[a]bsent cause shown, we anticipate final action by the agency pursuant to the remand within ninety days." *Id.* at 661 n. 47.

19. 49 Fed.Reg. 43,202 (1984). A petition to review this rulemaking is before the court in *Na-*

*tional Coal Association v. EPA,* No. 84–1609 (D.C.Cir.).

20. *Id.* at 43,208.

21. 49 Fed.Reg. 43,211 (1984).

22. *Id.* at 43,212.

23. *See infra* note 102.

24. 51 Fed.Reg. 15,803 (April 28, 1986); 51 Fed. Reg. 21,390 (June 12, 1986).

25. *See* Supplemental Statement of Respondents (Affidavit of Gerald Emison, Director of EPA Office of Air Quality Planning and Standards).

On February 24, 1986, Sierra Club filed complaints in both the district court and this court seeking declaratory and injunctive relief to compel EPA to conclude this rulemaking begun on October 24, 1984. In its complaints, Sierra Club contends that EPA has unreasonably delayed in promulgating regulations governing fugitive emissions from strip mines. On April 18, 1986, the district court dismissed the action before it, without prejudice, pending the resolution of Sierra Club's complaint before this court.[26] In so doing, the district court opined that, under *Telecommunications Research & Action Center v. FCC (TRAC)* [27] this court "may well have exclusive jurisdiction over the merits of this case." [28]

## II. DISTRICT COURT JURISDICTION

In *TRAC*, we acknowledged that our "somewhat inconsistent" decisions had left the law in a "state of disarray" concerning "whether a petition to compel allegedly unreasonably delayed agency action properly lies before this Court or before a United States District Court, or whether those courts have concurrent jurisdiction, when any final agency decision in the matter would be directly reviewable in this Court." [29] In resolving this question, we held that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals." [30]

Under section 307(b)(1) of the Act,[31] it is clear that this court will have jurisdiction to review the strip mine rulemaking when it becomes final. If that were the only relevant provision, *TRAC* would clearly apply in this case, but in fact the question of where jurisdiction lies is not so easily resolved. For unlike the statute involved in *TRAC*, and unlike most regulatory statutes with which we are familiar, the Act itself establishes, in section 304,[32] a role for the district court in reviewing agency action. This "citizen suits" provision states, in relevant part, that:

> any person may commence a civil action on his own behalf—against the [EPA] Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.... The district courts shall have jurisdiction ... to order the Administrator to perform such act or duty.

Act § 304(a)(2).[33] In three cases decided in 1975, we determined that this "citizen suits" provision grants independent jurisdiction to the district court over claims alleging that EPA has failed to perform a "nondiscretionary" duty.[34]

One of these cases, *NRDC v. Train,* warrants extended discussion here. In that case, we address NRDC's claim that, by

26. *Sierra Club v. Thomas,* Civ.No. 86–495 (D.D.C. September 16, 1986).

27. 750 F.2d 70 (D.C.Cir.1984).

28. *Sierra Club v. Thomas, supra* note 26, slip op. at 3.

29. *TRAC,* 750 F.2d at 74–75 & n. 21.

30. *Id.* at 75 (emphasis in original). *See Community Nutrition Institute v. Young,* 773 F.2d 1356, 1361 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1123, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

31. 42 U.S.C. § 7607(b)(1), which, in relevant part, provides that "[a] petition for review of ... any ... nationally applicable regulations promulgated, or final action taken, by the [EPA] Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia."

32. 42 U.S.C. § 7604.

33. *Id.* § 7604(a)(2).

34. *See Oljato Chapter of Navajo Tribe v. Train,* 515 F.2d 654, 659–62 (D.C.Cir.1975); *Natural Resources Defense Council, Inc. v. EPA,* 512 F.2d 1351, 1353–56 (D.C.Cir.1975); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 699–700 (D.C.Cir.1975) (*NRDC v. Train* ) (construing same provision in Federal Water Pollution Control Act Amendments of 1972, which "was explicitly 'modeled on the provision enacted in the Clean Air Amendments of 1970.'" (footnote omitted), *quoting* S.Rep. No. 92–414, 92d Cong., 1st Sess. 79 (1971), *reprinted in* Environmental Policy Division of the Congressional Reference Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, Vol. II, at 1497 (hereinafter "Legislative History of FWPCAA").

failing to promulgate enforcement guidelines for Group I sources, which the statute had enumerated for regulation, and for Group II sources, which the statute had left to the EPA Administrator to enumerate, EPA had failed to perform "a mandatory, nondiscretionary duty" to act in a timely fashion. NRDC relied principally upon the deadline established in the statute, which required publication of such guidelines "within one year of October 18, 1972." As to the Group I sources, we concluded that the October 18, 1973 deadline did indeed impose a nondiscretionary duty of timeliness, and that therefore the district court had jurisdiction "to compel performance of a statutory duty that has been unreasonably delayed." [35]

Whether the statute also imposed a nondiscretionary duty of timeliness with respect to promulgating guidelines for the Group II sources was a much more difficult issue to resolve. In contrast to the Group I sources, the Administrator argued that, notwithstanding the October 18, 1973 deadline, the statute provided him with "discretion over the date of publication of guidelines for those categories of point sources contained in Group II." [36] The Administrator's argument, basically, was that whereas the Group I sources were those for which Congress had mandated regulation by explicitly enumerating them in the statute, the Group II sources were those that, as the legislative history indicated, " 'the Administrator might add to th[e] list' " of sources that would be subject to regulation.[37] The Administrator interpreted the legislative history as providing EPA with discretion under the statute in determining which sources should be included within Group II and thereby subject to regulation. According deference to this interpretation of the statute, we concluded that:

> [T]he discretion provided [the Administrator] in delineating additional point sources extended to the publication date of the guidelines for those sources.... [As a result,] [w]e find that the [statute] does not require the publication of guidelines for [Group II sources] within one year after its enactment [i.e., by October 18, 1973] as a nondiscretionary imperative.[38]

Accordingly, because the October 18, 1973 deadline did not impose a nondiscriminatory duty of timeliness with respect to the Group II sources, a claim alleging "unreasonable delay" in failing to publish guidelines for Group II sources by this date was not subject to the district court's jurisdiction.[39]

As we went on to point out, however, "[w]hile we agree with the Administrator that he has some latitude concerning the date of publication of guidelines for Group II categories ... [t]he [statute] and its legislative history rein in the Administrator's discretion." [40] Under the statutory scheme, the enforcement guidelines "are intended to assist [EPA] in the establishment of [effluent] limitations." [41] These limitations, in turn, "are to be imposed upon individual point sources through permits issued under the National Pollutant Discharge Elimination System ("NPDES") established by the same statute." [42] The statute "prohibits the discharge of any pollutant unless there is compliance with" the NPDES permit program.[43] As we stated:

---

**35.** 510 F.2d at 704.

**36.** *Id.; see id.* at 705–06.

**37.** *Id.* at 706 (footnote omitted), quoting H.R. Rep. No. 92–911, 92d Cong., 2d Sess. 107 (1972), *reprinted in* Legislative History of FWPCAA, Vol. I at 794.

**38.** *Id.*

**39.** *Cf. National Congress of Hispanic American Citizens v. Usery (El Congreso I),* 554 F.2d 1196 (D.C.Cir.1977), and *National Congress of Hispan-*

ic American Citizens v. Marshall (El Congreso II), 626 F.2d 882, 891 (D.C.Cir.1979), in which we determined that certain statutory deadlines were not mandatory but left the agency with discretion.

**40.** *NRDC v. Train,* 510 F.2d at 706.

**41.** *Id.* at 707.

**42.** *Id.*

**43.** *Id.*

[The statute makes] December 31, 1974, a critical date. Until then, the pendency of a permit application will prevent a finding of violation of [the discharge prohibition]. After December 31, 1974, however, persons discharging pollutants must have obtained a permit in order to have a legal defense against prosecution. Obviously, Congress contemplated that the task of evaluating permit applications and issuing permits would be completed by that date.[44]

In light of this we concluded that:

[It was] the contemplation of Congress that the Administrator has a primary responsibility to publish effluent guidelines for the great bulk of the classes and categories of point sources prior to the December 31, 1974, date by which existing polluters must obtain permits. The general expectation of Congress was that the Administrator would define classes and categories of point sources and would publish guidelines prior to the issuance of the individual permits. The contours of the Administrator's duty with respect to [these] guidelines are revealed by the purposes which those guidelines were designed to serve.[45]

In summary, we concluded that, although the Administrator had discretion whether to list a source under Group II, and was not obliged to list such sources by the deadline for publishing Group I guidelines, the Administrator did have a statutory duty of timeliness in deciding which sources to so list. The question, therefore, became whether that duty of timeliness was nondiscretionary, with the result that the district court would have jurisdiction over a claim alleging failure to perform this duty. We determined that:

The statutory framework is not so tightly drawn as to require guidelines for each and every class and category of point source regardless of the need for uniform guidelines or to mandate that all guidelines be published by December 31[, 1974], regardless of their quality or the burden that task would place upon the agency.

However, the general contemplation that guidelines would precede individual permits indicates that guidelines serving the objectives of the Act are to be published prior to December 31, 1974, unless the Administrator offers a justification for abstention or delay, demonstrating that he has not failed to discharge his general duty with respect to [the] guidelines.[46]

In other words, we concluded that "although we believe that guidelines covering most point source categories should be readied by [December 31, 1974], we do not read the statutory scheme as categorically mandating that all guidelines be published by that time."[47] Moreover, we further concluded that "[a]lthough some lead time between guideline publication, effluent limitation promulgation, and permit issuance is desirable ... the Act does not provide us with a benchmark for gauging when prior to December 31[, 1974], the Administrator has a duty to issue regulations pertaining to any particular point source categories."[48]

As this summary of *NRDC v. Train* shows, the statute did not clearly indicate whether the general duty to publish guidelines by December 31, 1974 was a nondiscretionary duty covered by the "citizen suits" provision for district court review "or is more appropriately subject to challenge under the Administrative Procedure Act [APA] as an abuse of discretion or an agency action unreasonably delayed."[49] We found it unnecessary to resolve this question, however. First, the record did not indicate whether EPA had met the December 31, 1974 deadline that, we inferred, applied generally to the promulgation of Group II guidelines. Second, at that time

44. *Id.* (footnotes omitted).

45. *Id.* at 710.

46. *Id.* at 710–11.

47. *Id.* at 712.

48. *Id.* at 711 (footnote omitted).

49. *Id.* at 714.

we believed (erroneously, it turned out [50]) that the district court could exercise general "federal question" jurisdiction over this type of delay claim. As a result, we remanded the ease to the district court, without deciding whether the inferred December 31, 1974, deadline imposed on the EPA a nondiscretionary duty or, alternatively, a duty under the APA not to abuse its discretion or to delay action unreasonably. Instead, noting that "[t]he distinction between these approaches tends to be abstract and conceptual ... [we left] the parsing out of the lines separating these approaches to a later case," [51] which has not arisen as yet.[52]

What conclusions can we draw, in the light of *NRDC v. Train* and *TRAC*, concerning which court, under the bifurcated jurisdictional scheme of the Clean Air Act, has jurisdiction over claims alleging unreasonable agency delay? On the most basic level, *NRDC v. Train* stands for the proposition that the district court has jurisdiction over claims alleging that an agency has violated a nondiscretionary duty of timeliness, such as the duty imposed by the October 18, 1973 deadline with respect to Group I sources. Our jurisdictional holding in *TRAC* does not require us to qualify this rule because *TRAC*, by its own terms, applies only in situations "where a statute

commits review of agency action to the Court of Appeals" and thus where interlocutory review of an unreasonable delay claim is "necessary to protect [this court's] prospective jurisdiction." [53] By necessary implication, *TRAC* does not apply where a statute instead commits review of an alleged instance of agency action (or here inaction) to the district court, as does section 304(a)(2).[54]

*NRDC v. Train* also illustrates that it is often far easier to announce the jurisdictional rule than to apply it by determining whether any particular duty of timeliness is discretionary, so that review lies in this court, or else is nondiscretionary, with review in the district court. The only holdings in that decision were that the mandatory deadline of October 18, 1973, imposed a nondiscretionary duty for promulgating Group I guidelines, enforceable in district court, and that it did not impose a nondiscretionary duty for promulgating Group II guidelines. From these holdings, we may conclude two things: (1) a nondiscretionary duty of timeliness may arise even if a deadline is not explicitly set forth in the statute, if it is readily-ascertainable by reference to some other fixed date or event [55]; and (2) such a deadline (of either variety) may or

50. *See Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977); *TRAC,* 750 F.2d at 77.

51. *NRDC v. Train,* 510 F.2d at 714.

52. The question of whether the district court or the circuit court has jurisdiction of an agency delay claim can be a difficult one, as illustrated by *NRDC v. Train.* During the hearings concerning the Clean Air Act Amendments of 1977, the Administrative Conference of the United States recommended that Congress grant the court of appeals exclusive jurisdiction over claims alleging delay in the promulgation of regulations, which would have mooted the question. *See* Clean Air Act Amendments of 1977; Hearing Before the Subcommittee on Environmental Pollution and Public Works, 95th Cong., 1st Sess. 249 (1977). Congress did not act on this or any like suggestion; the preexisting case law therefore remains unaffected by the 1977 Amendments.

53. *TRAC,* 750 F.2d at 75–76.

54. In *TRAC,* we explained our holding—that this court had exclusive jurisdiction of unreasonable

delay claims involving situations "where a statute commits review of agency action to the Court of Appeals," 750 F.2d at 70—by stating that "[b]ecause the District Court has no present or future jurisdiction over agency actions assigned by statute to appellate court review, it can contemplate no exercise of jurisdiction that mandamus might aid." *Id.* at 77 (footnote omitted). The same reasoning, only reversed, applies to render exclusive the district court's jurisdiction of agency delay claims that involve a nondiscretionary duty of timeliness. In fact, *TRAC* itself recognized the possibility of some remaining district court review when, citing *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), it left open the possibility of district court jurisdiction "in the *very limited circumstances* where the [agency] has clearly violated an express mandate of the statute." 750 F.2d at 78 (emphasis in original).

55. In fact, the deadline as set forth in the statute was actually "within one year from October 18, 1972."

may not impose a nondiscretionary duty of timeliness.

■ We did not decide in *NRDC v. Train* whether a district court can enforce as nondiscretionary a duty of timeliness imposed by a deadline that is not readily-ascertainable but instead exists only as the product of a set of inferences based upon the overall statutory scheme.[56] The answer is apparent, however, because Congress provided for district court enforcement under section 304 in order to permit citizen enforcement of "clear-cut violations by polluters or defaults by the Administrator"[57] where the only required judicial role would be to make a clear-cut factual determination of whether a violation did or did not occur. District courts are better suited to making factual determinations than are courts of appeals, and this no doubt is why Congress determined that district courts should have jurisdiction over this type of claim. In order to impose a clear-cut nondiscretionary duty, we believe that a duty of timeliness must "categorically mandat[e]" that *all* specified action be taken by a date-certain deadline.[58] In such circumstances, the only question for the district court to answer is whether the agency failed to comply with that deadline. Such a duty was imposed in *NRDC v. Train*, for example, by the October 18, 1973, deadline as applied to the Group I sources. That date-certain deadline, however, did not create a nondiscretionary duty of timeliness as applied to the Group II sources, because we concluded that the statute contemplated

that, as to those sources, EPA could make exceptions in meeting the deadline.

Although a date-certain deadline therefore may or may not be nondiscretionary, it is highly improbable that a deadline will ever be nondiscretionary, i.e. clear-cut, if it exists only by reason of an inference drawn from the overall statutory framework."[59] As in the case of the December 31, 1974, deadline in *NRDC v. Train*, this type of inferrable deadline is likely to impose merely a "general duty" of timeliness, one which does not result in *per se* violations, but instead requires assessment of both the need for "quality" in the agency's actions and the "burden" that compliance with the deadline would impose upon the agency.[60] The inferrable deadline is likely to impose such a discretionary duty because it rests, at bottom, upon a statutory framework that will almost necessarily place competing demands upon the agency's time and resources. In the absence of a readily-ascertainable deadline, therefore, it will be almost impossible to conclude that Congress accords a particular agency action such high priority as to impose upon the agency a "categorical[ ] mandat[e]"[61] that deprives it of all discretion over the timing of its work.

■ Although there may be isolated occasions when, upon extensive analysis, one can conclude that an inferrable deadline imposes a mandatory duty of timeliness, we believe that they will be very rare. Accordingly, considerations of efficiency and fairness to litigants suggest that when no deadline can be readily-ascertainable

---

56. The example of such a deadline in that case, of course, was the date after which operators needed a NPDES permit to discharge legally—December 31, 1974. We determined that, under the "statutory framework," Congress "contemplat[ed] that the Administrator ... [would] publish ... guidelines for the great bulk of [Group II sources] prior to the December 31, 1974, date by which existing polluters must obtain permits." *NRDC v. Train*, 510 F.2d at 710. As a result, we concluded that the Administrator had a "general duty" to publish Group II deadlines by this date, but that the statute did not "mandate that all guidelines be published by [that date] regardless of their quality or the burden that task would place upon an agency." *Id.* at 711.

In addition to *NRDC v. Train*, we are aware of one other case in which a deadline has been inferred from the structure of a statute. *See In re Center for Auto Safety*, 793 F.2d 1346 (D.C. Cir.1986).

57. *NRDC v. Train*, 510 F.2d at 700.

58. *Id.* at 712. Again, such deadline may exist, even though not explicitly set forth in the statute, if it is readily-ascertainable by reference to a fixed date or event.

59. *Id.* at 710.

60. *Id.* at 711.

61. *Id.* at 712.

from the statute, but is merely inferred from the overall statutory scheme, a claim alleging unreasonable delay under the Clean Air Act should come to this court under section 307 of the Act and the jurisdictional rule announced in *TRAC*.[62] The questions that will generally arise from these inferrable deadlines, such as whether non-compliance is justified by the need for "quality" or by the "burden[s]" that compliance would impose on an agency,[63] are more suited for resolution by courts of appeals, because we "develop an expertise concerning the agencies assigned [us] for review."[64]

There exists an additional reason for finding a nondiscretionary duty of timeliness only in situations in which the agency operates under a readily-ascertained deadline. Without such a limitation, the distinction embodied in sections 304 and 307—between review of nondiscretionary and review of discretionary agency action—disappears. If it need not comply with a specific deadline, then EPA, if it is under any duty of timeliness, must merely avoid unreasonable delay. We long ago rejected, as inconsistent with congressional intent in enacting sections 304 and 307, the convoluted notion that EPA is under a nondiscretionary duty—for purposes of section 304(a)(2) —not to abuse its discretion.[65] As is evident, when taken to its logical conclusion, this argument would grant jurisdiction to the district court over all claims alleging abuse of discretion, a result clearly at odds with both review for abuse of discretion in the court of appeals under section 307 and with the undisputably limited nature of review in the district court under section 304(a)(2). Accordingly, we now reject the equivalent contention as applied to claims

of unreasonable delay. Where Congress has established no date-certain deadline— explicitly or implicitly—but EPA must nevertheless avoid unreasonable delay, it does not follow that EPA is, for the purposes of section 304(a)(2) under a nondiscretionary duty to avoid unreasonable delay. Instead, this type of duty is discretionary and, pursuant to *TRAC*, this court reviews claims alleging unreasonable delays of this type in order that we may protect our eventual jurisdiction under section 307 to review the final EPA action.[66]

In this case, the Act imposes no date-certain deadline on EPA to conclude the rulemaking before us. There is no such deadline relating explicitly to either section 302(j) or to section 169(1), the two operative provisions relating to determinations of what is a "major emitting facility." Nor can we infer such a deadline from the overall scheme of the PSD program in general. Accordingly, if EPA had any duty to avoid unreasonable delay, it was a discretionary duty. Jurisdiction over Sierra Club's claim alleging unreasonable delay, therefore, does not lie with the district court under section 304(a)(2).

### III. COURT OF APPEALS JURISDICTION WITHOUT "FINAL AGENCY ACTION"

It does not follow automatically that, if the district court lacks jurisdiction, then it must lie in this court, for both courts have just so much jurisdiction as Congress has provided by statute. Congress in section 307(b)(1) has granted this court jurisdiction only to review "any ... nationally applicable regulations promulgated, or final action taken" under the Act. Sierra Club complains, however, that EPA

---

62. As we have indicated, a readily-ascertainable deadline may be either nondiscretionary or discretionary. Because Sierra Club does not here claim that EPA has unreasonably delayed by failing to comply with a readily-ascertainable deadline, we need not decide here whether claims involving such deadlines should proceed first to the district court or to this court.

63. *NRDC v. Train,* 510 F.2d at 711.

64. *TRAC,* 750 F.2d at 78.

65. *See Oljato Chapter of Navajo Tribe v. Train,* 515 F.2d at 662–63.

66. As we indicate below, this interlocutory intervention is necessary either because a substantive statutory right would be effectively denied as a result of agency delay, or else because the relevant statute, either implicitly or by incorporating sections 555(b) and 706(1) of the APA, prohibits unreasonable delay, and such delay cannot be remedied when reviewing the final order because the clock cannot be turned back.

has not yet promulgated a rule under section 302(j) that finally determines whether strip mines are to be listed as a source of "fugitive emissions." As *TRAC* indicates, though, our jurisdiction under a "final agency action" review provision is not limited to situations in which "final action," as it is commonly understood, has indeed been taken. Under such provisions, we also have jurisdiction to review agency inaction, which may take any of three forms, all of which relate, one way or the other, to our ability to provide effective review of final action.

### A. *Effectively final action not acknowledged*

First, agency inaction may represent effectively final agency action that the agency has not frankly acknowledged: "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."[67] In such a situation, "the court can undertake review as though the agency had denied the requested relief and can order an agency to either act or provide a reasoned explanation for its failure to act."[68] In the instant case, Sierra Club does not allege, nor does our review of the ongoing October 1984 rulemaking suggest, that EPA's failure as yet to issue a final rule reflects an acknowledged EPA decision to exclude strip mines from the list of section 302(j) sources.

### B. *Recalcitrance in the face of duty*

Second, agency inaction may represent "agency recalcitrance ... in the face of a clear statutory duty ... of such magnitude that it amounts to an abdication of statutory responsibility."[69] Examples of such clear duties to act include provisions that require an agency to take specific action when certain preconditions have been met.[70] When an agency violates such a duty through inaction, "the court has the power to order the agency to act to carry out its substantive statutory mandates."[71]

This court may have jurisdiction to review claims alleging inaction in this type of case for either or both of two reasons. If the withheld agency action would be reviewable under the APA, then this type of inaction represents action that has been "unlawfully withheld";[72] the agency might forever evade our review and thus escape its duties if we awaited final action before reviewing this claim. Even as to those actions not covered by the APA, it is apparent that, if an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers "final agency action" review.

In either case, pursuant to a "final agency action" review provision and our decision in *TRAC*, this court would normally exercise jurisdiction over such a claim.[73]

---

67. *Environmental Defense Fund, Inc. v. Hardin* (*EDF v. Hardin*), 428 F.2d 1093, 1099 (D.C.Cir. 1970) (footnote omitted). *See Public Citizen Health Research Group v. FDA* (*PCHRG v. FDA*), 740 F.2d 21, 32, 35 (D.C.Cir.1984).

68. *PCHRG v. FDA*, 740 F.2d at 32.

69. *Id.*

70. In *Environmental Defense Fund, Inc. v. Ruckelshaus* (*EDF v. Ruckelshaus*), 439 F.2d 584, 593–95 (D.C.Cir.1971), we held that statutory preconditions had been satisfied so as to compel specific agency action. *See* the discussion of this case in *PCHRG v. FDA*, 740 F.2d at 33.
   *Cf. Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C.Cir.1973) (en banc), where the agency had a duty to impose one of two sanctions in response to statutory noncompliance, but we held that the agency could withhold sanctions for a "reasonable" time while seeking voluntary compliance. Agency inaction in any one instance would therefore be reviewable in terms of "unreasonable delay" rather than as "recalcitrance ... in the face of a clear statutory duty." Agency "recalcitrance" could be shown, however, if there were "a consistent failure" to impose sanctions within a reasonable period of time. *Id.* at 1163.

71. *PCHRG v. FDA*, 740 F.2d at 32. *See Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

72. 5 U.S.C. § 706(1).

73. Where Congress has precluded review by the court of appeals, *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), held that the district court could exercise jurisdiction over this type of claim. *See TRAC*, 750 F.2d at 78.

Under the Clean Air Act's unusual, bifurcated jurisdictional scheme, however, a claim of "agency recalcitrance ... in the face of a clear statutory duty" would in most instances represent a claim that EPA has failed to perform a nondiscretionary duty. As we have indicated, such a claim must be brought in the district court, under section 304(a)(2). As explained above, Sierra Club does not here claim that EPA has violated such a nondiscretionary duty.

### C. Unreasonable delay of final action

Third, we may review agency inaction that is alleged to work an "unreasonable delay" of final action. The gravamen of Sierra Club's complaint in this case is that EPA is taking an unreasonably long time to reach a decision on whether to include strip mines in the list. Unlike claims alleging agency recalcitrance in the face of a "clear statutory duty," the petitioner alleging "unreasonable delay" does not contend that agency inaction violates a clear duty to take a particular action by a date certain. Instead, as in those cases involving unacknowledged final action, the claim is that while the agency may have discretion over whether to act at all, it has exercised that discretion by deciding that it would determine what action, if any, to take, and that it must now do so.[74] What differentiates "unreasonable delay" from "unacknowl-

edged final action" is that the petitioner who pleads the former concedes that the agency is still analyzing the matter, but complains that the process is taking too long. To phrase it differently, the claim is that "the pace of the agency decisional process ... lags unreasonably." [75]

As we indicated in TRAC, "unreasonable delay" claims may be further differentiated into two types based upon the harm allegedly inflicted:

1. Right to a timely decision. The first type of claim is that agency delay deprives the petitioner of a statutory "[r]ight to [t]imely [d]ecisionmaking." [76] It thus resembles to some extent claims involving "agency recalcitrance ... in the face of a clear statutory duty," except that the statutory duty involved here does not specify what course of action shall be taken. Rather, regardless of what course it chooses, the agency is under a duty not to delay unreasonably in making that choice.

As our previous decisions indicate, agencies most often fall under this duty of timeliness as a result of the APA's broad prohibition against "unreasonable delay." [77] In other situations, the substantive statute itself may impose the obligation. This arises either because the statute expressly imposes a deadline [78] or otherwise exhorts

---

**74.** *Adams v. Richardson, supra* note 70, is an exception. In that case, the agency was under a clear statutory duty to take particular action, but the statute imposed no definite deadline for doing so. Rather, we found that the agency could not unreasonably delay complying with the statutory mandate.

**75.** *PCHRG v. FDA,* 740 F.2d at 32.

**76.** *Potomac Elec. Power Co. v. ICC (PEPCO),* 702 F.2d 1026, 1033, supplemental opinion, 705 F.2d 1343 (D.C.Cir.1983).

**77.** 5 U.S.C. §§ 555(b), 706(1). *See Costle v. Pacific Legal Foundation,* 445 U.S. 198, 220 n. 14, 100 S.Ct. 1095, 1108 n. 14, 63 L.Ed.2d 329 (1980); *Cutler v. Hayes,* 818 F.2d 879, 894–95 (D.C.Cir.1987); *In re Center for Auto Safety,* 793 F.2d at 1349; *In re American Federation of Government Employees,* 790 F.2d 116, 117 (D.C.Cir.1986); *United Steelworkers of America v. Rubber Mfrs. Assoc.,* 783 F.2d 1117, 1120 (D.C.Cir.1986); *Oil, Chemical & Atomic Workers In-*

*tern. v. Zegeer,* 768 F.2d 1480, 1485–86 (D.C.Cir.1985); *Air Line Pilots Ass'n, Intern. v. CAB,* 750 F.2d 81, 85 (D.C.Cir.1984); *TRAC,* 750 F.2d at 76–77, 79; *PCHRG v. FDA,* 740 F.2d at 32; *Public Citizen Health Research Group v. Auchter (PCHRG v. Auchter),* 702 F.2d 1150, 1153–54, 1158 (D.C.Cir.1983); *PEPCO,* 702 F.2d at 1032, 1034; *MCI Telecommunications Corp. v. FCC (MCI v. FCC),* 627 F.2d 322, 345 (D.C.Cir.1980); *Nader v. FCC,* 520 F.2d 182, 206 (D.C.Cir.1975); *EDF v. Ruckelshaus,* 439 F.2d at 593; *EDF v. Hardin,* 428 F.2d at 1099 & n. 29.

**78.** *See In re Center for Auto Safety,* 793 F.2d at 1349; *El Congresso II,* 626 F.2d at 891; *El Congresso I,* 554 F.2d at 1198–1200. As we stated earlier, if a deadline is deemed mandatory, then jurisdiction under the Act lies in the district court pursuant to section 304(a)(2). (In such instances, the line dividing "unreasonable delay" and "unlawfully withheld" action blurs.) *See Center for Auto Safety, supra.* If, alternatively, the deadline simply imposes a duty of reasonable timeliness, then jurisdiction lies in this court pursuant to section 307(b)(1).

timely behavior,[79] or because the statutory scheme implicitly contemplates final action within a reasonable amount of time.[80] In all these situations, a "final agency action" review provision confers jurisdiction upon this court to review the inaction claim for the same reason that justifies review of action "unlawfully withheld"—*viz.* without such review, the agency could effectively evade its statutory duty of timeliness.[81]

2. *Other rights abridged by delay.* The second group of "unreasonable delay" claims presents a different type of harm. The petitioner here does not contend that the agency, in delaying final action, has violated a statutory "[r]ight to [t]imely [d]ecisionmaking," [82] but that the delay will work to deprive it of a different right granted it by Congress. The classic example of this latter type of harm is the undue length of rate proceedings conducted by the Federal Communications Commission. In *Nader v. FCC,*[83] *MCI v. FCC,*[84] and *TRAC* itself, we held that the FCC was under a "rule of reason" as to the length of rate proceedings. This rule of reason was, in part, implicit in the statute itself, which required only that rates be "just and reasonable," not that they be "perfect." [85] In addition to this implicit duty of timeliness, however, we found that unreasonable delay by the FCC in setting "just and reasonable" rates would effectively deprive ratepayers of their statutory right to such rates, because the refund remedy established by the statute—under which the utility could charge its proposed rate during the course of the proceedings, but would have to refund any amount received in excess of the rate eventually determined to be "just and reasonable"—will not provide effective relief in situations where proceedings have extended for too long a period of time.[86] In this situation, just as in the case of a duty to make a timely decision, this court may review agency delay because it "jeopardizes our future review of the final [agency] decision" if review may come so late that no effective relief will be available.[87] If we find that the agency has

---

**79.** *See PCHRG v. Auchter,* 702 F.2d at 1153 ("Congress has instructed OSHA, in determining the priority for establishing standards, to 'give due regard to the urgency of the need for mandatory ... health standards for particular ... workplaces.' 29 U.S.C. § 655(g)."); *PEPCO,* 702 F.2d at 1033–35.

**80.** *See MCI v. FCC,* 627 F.2d at 340–42 (by requiring rates that are not perfect but are instead merely "just and reasonable," 1934 Communications Act contained inherent "rule of reason" as to length of proceedings); *Adams v. Richardson,* 480 F.2d at 1163; *American Broadcasting Co. v. FCC,* 191 F.2d 492, 500–501 (D.C.Cir.1951) ("special service authority" is for "temporary" service, and so could not be extended for ten years when the statute limits a full license to three years duration; *see* our discussion of this case in *MCI v. FCC,* 627 F.2d at 343–44).

**81.** "[O]nce the Commission has rendered a decision on the appeal from the ALJ's initial decision, the issue of the timeliness of the Commission's decision will be moot. Consequently, if review is denied until the Commission's decision, there will be no effective remedy for the parties harmed by the Commission's delay, even if that delay directly contravenes the intent of Congress...." *PEPCO,* 702 F.2d at 1032. *See TRAC,* 750 F.2d at 76 n. 29.

**82.** *PEPCO,* 702 F.2d at 1033.

**83.** *See supra* note 79.

**84.** *See id.*

**85.** *MCI v. FCC,* 627 F.2d at 340.

**86.** *See TRAC,* 750 F.2d at 80–81; *MCI v. FCC,* 627 F.2d at 340, 342, 344–45; *Nader v. FCC,* 520 F.2d at 206. *See also PEPCO,* 702 F.2d at 1035.

**87.** *PEPCO,* 702 F.2d at 1033. In *TRAC,* we similarly bifurcated our analysis as to the propriety of reviewing agency delay. We initially addressed the situation where our "review on the merits may be defeated" through agency delay, and therefore where we "may resolve claims of unreasonable delay in order to protect [our] future jurisdiction." 750 F.2d at 76. This corresponds to the situation exemplified by the FCC cases discussed in the text, and was one basis for exercising jurisdiction in *TRAC.* ("In the instant case, the FCC has delayed almost five years on the rate of return inquiry and nearly two years on the proper ratemaking treatment of ... development expenses. These delays have permitted AT & T's allegedly excessive returns to 'become for all practical purposes, the accepted' ones." *Id.* at 80–81, quoting *MCI v. FCC,* 627 F.2d at 325.) We then held in *TRAC* that the APA's explicit duty of timeliness "provides additional support for our jurisdiction" in unreasonable delay cases. As we have done in the instant case, we acknowledged in *TRAC* that review pursuant to such an express duty of timeliness proceeds on "a slightly different rationale" from that based

unreasonably delayed, then we have the authority, under the All Writs Act, 28 U.S.C. § 1651, to issue a writ of mandamus to compel the agency to take final action.[88]

To summarize, for this court to have jurisdiction over Sierra Club's claim alleging "unreasonable delay" of a rulemaking proceeding, we must find that Sierra Club has a right the denial of which we would have jurisdiction to review upon final agency action but the integrity of which might be irreversibly compromised by the time such review would occur. As our discussion has indicated, this may be the right to timely decisionmaking itself or some other interest that will be irreparably harmed through delay.

### D. *APA Duty to Avoid Unreasonable Delay*

Sierra Club asserts a right to timely decisionmaking under the APA. Claiming that EPA has unreasonably delayed promulgating a final rule, Sierra Club petitions us to compel the agency to conclude the rulemaking it began in October 1984 in order to determine whether fugitive emissions from strip mines are to be included in deciding what are "major emitting facilities" for the PSD program. In opposing this request, EPA contends that it is under no duty to avoid "unreasonable delay" because section 307(d)(1)(I) of the Act [89] excludes PSD rulemakings (Part C of the Act) from the coverage of the APA. EPA points out that Congress, after it displaced the APA at large, then expressly reincorporated many of the APA standards, section 307(d)(9)(A)–(D), but did not reimpose the prohibition against "unreasonable delay" found in section 706(1) of the APA.[90] According to EPA Congress suspended this generally applicable prohibition in favor of providing specific deadlines for particular actions required by the Act. Because Congress did not impose any such deadline on the PSD rulemaking before us, EPA would have us infer that it is not subject to any duty of timeliness here.

Although superficially quite plausible, upon closer inspection, we find EPA's argument unpersuasive. In accordance with this court's holding in *Alabama Power Co. v. Costle,* even though the October 1984 rulemaking relates to PSD regulation under Part C, it in fact directly involves whether strip mines should be listed as sources of fugitive emissions for the purposes of the Act's generic definitions of "major stationary source" and "major emitting facility" in section 302(j) of the Act.[91] Section 307(d)(1) does not exclude rulemakings under section 302(j) from the coverage of the APA. Furthermore, the generic definitions in section 302(j) apply to both the PSD program (Part C of the Act) and to the nonattainment program (Part D of the Act),[92] as EPA conceded in the October 1984 rulemaking proposals and in its brief before us.[93] Section 307(d)(1) does not exclude Part D rulemakings from coverage of the APA. If the October 1984 rulemaking were exempted from the coverage of the APA merely because it implements the PSD program, therefore, the exemption for Part C rulemakings would affect a rulemaking that also implements the nonattainment program, which would be contrary to the intent of Congress.

■ Although the practical effect of the rulemaking proposal may be limited to that of subjecting strip mines to PSD regulation, the proposal itself directly involves

on our inability to provide effective relief for the violation of a different right when review of the final action occurs. 750 F.2d at 76 n. 29. For a similar reading of *TRAC, see Oil, Chemical & Atomic Workers Intern. v. Zegeer,* 768 F.2d at 1485.

**88.** *See TRAC,* 750 F.2d at 76; *PEPCO,* 702 F.2d at 1032–33.

**89.** 42 U.S.C. § 7607(d)(1)(I) excludes from coverage of the APA the "promulgation or revision of regulations under part C of subchapter I of

this chapter (relating to prevention of significant deterioration of air quality and protection of visibility)."

**90.** 42 U.S.C. § 7607(d)(9)(A)–(D).

**91.** 42 U.S.C. § 7602(j).

**92.** 42 U.S.C. § 7501 *et seq.*

**93.** *See* 49 Fed.Reg. 43202; 49 Fed.Reg. 43211; EPA Brief at 13.

whether they should be listed under section 302(j). Because neither section 302(j) nor Part D, to which it applies, have been excluded from coverage of the APA, we conclude that the APA's duty of reasonable timeliness applies to this rulemaking. Accordingly, we have jurisdiction over Sierra Club's claim, and we must determine whether EPA has unreasonably delayed reaching a final decision on whether to list strip mines.

## IV. MERITS OF SIERRA CLUB'S CLAIM

Because "a court is in general ill-suited to review the order in which an agency conducts its business," we are properly hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus to give it precedence over others.[94] Nevertheless, when as here an agency has a statutory duty to avoid "unreasonable delay," we must review the ongoing proceedings to determine "whether the agency's delay is so egregious as to warrant mandamus."[95] It is well established that, in conducting this review, "[t]he reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action."[96] In particular, if, as in this case, the claim is that the agency's

delay deprives the petitioner of a statutory right to timely decisionmaking, then we look to see whether Congress has imposed any applicable deadlines or otherwise exhorted swift deliberation concerning the matter before us or whether the statutory scheme implicitly contemplates timely final action; whether interests other than that of timely decisionmaking will be prejudiced by delay; and whether an order expediting the proceedings will adversely affect the agency in addressing matters of a competing or higher priority.[97] When we assess these factors, we must remember that, "[a]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference."[98]

Turning to these considerations, we do not believe, first, that Congress has accorded any special priority to completion of the rulemaking before us. No statutory deadline limits the duration of rulemakings under either the PSD program or section 302(j).[99] Nor can we perceive in the Act a generalized congressional mandate for EPA to expedite these particular rulemakings.[100]

---

**94.** *EDF v. Hardin,* 428 F.2d at 1099. *See Heckler v. Day,* 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984); *Cutler v. Hayes,* 818 F.2d at 897–98; *Community Nutrition Institute v. Young,* 773 F.2d at 1361; *Oil, Chemical & Atomic Workers Intern. v. Zegeer,* 768 F.2d at 1488; *PCHRG v. FDA,* 740 F.2d at 34; *PCHRG v. Auchter,* 702 F.2d at 1158; *El Congresso II,* 626 F.2d at 889 ("With its broader perspective, and access to a broad range of undertakings, and not merely the program before the court, the agency has a better capacity than the courts to make the comparative judgments involved in determining priorities and allocating resources."); *El Congresso I,* 554 F.2d at 1199–1200.

**95.** *TRAC,* 750 F.2d at 78.

**96.** *PCHRG v. Auchter,* 702 F.2d at 1158 n. 30, quoting *El Congresso II,* 626 F.2d at 888.

**97.** *See Cutler v. Hayes,* 818 F.2d 879, 897–899 (D.C.Cir.1987); *Oil, Chemical & Atomic Workers Intern. v. Zegeer,* 768 F.2d at 1487; *TRAC,* 750 F.2d at 80; *PCHRG v. FDA,* 740 F.2d at 34; *PCHRG v. Auchter,* 702 F.2d at 1150.

**98.** *Sierra Club v. Gorsuch,* 715 F.2d at 658 (footnotes omitted).

**99.** Because the Act imposed deadlines in some areas, we must conclude that Congress' failure to impose deadlines elsewhere was not inadvertent. In our recent decision in *Cutler v. Hayes,* 818 F.2d at 897 n. 158, we stated that the Supreme Court's "stern counsel [in *Heckler v. Day,* 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984) ] against judicial imposition of mandatory deadlines, where legislative history strongly indicates congressional repudiation of them, clearly applies to delay claims under the APA." Accordingly, while we do not believe that the absence of pertinent deadlines disposes of Sierra Club's claim, we nevertheless do believe that, under *Heckler v. Day,* the presence of deadlines elsewhere in the statute is a factor counseling against judicial intervention. *Cf. Oil, Chemical & Atomic Workers Intern. v. Zegeer,* 768 F.2d at 1488, which predates *Heckler v. Day.*

**100.** In its briefs to this court, Sierra Club argues that EPA's delay dates back to our decision in *Sierra Club v. Gorsuch,* if not earlier to the 1980 rulemaking that was the subject of that decision. Although it is true that this court has jurisdiction to enjoin agencies from unreasonably delaying compliance with a court order, *see PEPCO,* 702 F.2d at 1032, Sierra Club misconstrues

Concerning, second, any interests other than timeliness itself compromised by delay of this rulemaking, we find that the Act does not instruct EPA to regulate strip mine fugitive emissions, nor does it require EPA even to consider this question. As a result, Sierra Club cannot claim a statutory right that, through delay of a regulation governing this activity, might be irreparably harmed. Moreover, although this court has required greater agency promptness as to actions involving interests relating to human health and welfare, with respect to which delay is arguably less justifiable than in the realm of economic regulation,[101] this factor alone can hardly be considered dispositive when, as in this case, virtually the entire docket of the agency involves issues of this type. In such circumstances, whether the public health and welfare will benefit or suffer from accelerating this particular rulemaking depends crucially upon the competing priorities that consume EPA's time, since any acceleration here may come at the expense of delay of EPA action elsewhere.

Turning to this final consideration, we must remember that Congress has assigned EPA a very broad mandate, not only under the Clean Air Act but also under a handful of other equally complex environmental statutes. Given that Congress provides EPA with finite resources to satisfy these various responsibilities, the agency cannot avoid setting priorities among them. As we have said, we can perceive no statutory command that EPA assign this rulemaking a higher priority than any of its other activities. If anything, this rulemaking might reasonably have a lower priority than many EPA activities because PSD regulation, which would be the main reason for listing strip mine fugitive emissions, pertains to regions of the country that exceed the NAAQS minimum health and welfare standards of the Act.

■ In any event, less than three years have passed since EPA initially proposed this rulemaking. During this time, EPA has prepared a Regulatory Impact Analysis, released in February 1986[102]; conducted a number of public hearings, the latest in April 1986; and received approximately 200 written submissions that it must consider and take into account before it can issue a rulemaking decision. A simple reading of the Clean Air Act reveals that whether to impose a certain type of regulation often involves complex scientific, technological, and policy questions. EPA must be afforded the amount of time necessary to analyze such questions so that it can reach considered results in a final rulemaking that will not be arbitrary and capricious or an abuse of discretion.[103] Indeed, by decreasing the risk of later judicial invali-

---

101. *See* cases cited in *supra* note 97.

our holding in *Sierra Club v. Gorsuch* to require that EPA "render a final decision on the strip mines issue within 90 days." Brief for Sierra Club at 23. As we made clear in that decision, our review was limited to the question of whether the 1980 list of sources was arbitrary and capricious because strip mines were not included therein; we expressly disavowed deciding whether the Act itself imposed an obligation to regulate strip mines. 715 F.2d at 657–58; *see supra* note 15. Because we found troubling the omission of strip mines from this overall list, we ordered EPA to reconsider the omission. We initially required EPA to move expeditiously, but the matter became complicated when, in August 1983, EPA withdrew the 1980 rulemaking, and issued a new proposal. In April 1984, we ordered EPA, within six months, to issue a proposal on whether to list strip mines. EPA complied with that mandate when it issued the October 1984 proposal, and as a result we terminated the docket in *Sierra Club v. Gorsuch.* Accordingly, any delay dates from the issuance of the October 1984 proposal.

102. Whether requiring that the RIA be conducted was lawful under the Act is a question pending before this court in *National Coal Association v. EPA*, No. 84–1609 (D.C.Cir.). In considering the RIA in our analysis, we express no opinion on that matter, but simply note that the RIA necessarily consumed some time and that its undertaking is indicative that EPA has not simply abandoned the October 1984 proposal, but that its consideration continues.

103. *See United Steelworkers of America v. Rubber Mfrs. Assoc.*, 783 F.2d at 1120 ("judicial imposition of an overly hasty timetable at this stage would ill serve the public interest. The rule ultimately promulgated by the agency, not to mention the agency's rationale for the rule, must be construed carefully and thoroughly if the agency's action is to pass judicial scrutiny....").

dation and remand to the agency, additional time spent reviewing a rulemaking proposal before it is adopted may well ensure earlier, not later, implementation of any eventual regulatory scheme. Given the complexity of the issues facing EPA and the highly controversial nature of the proposal, agency deliberation for less than three years—little more than one year since the close of the public comment period—can hardly be considered unreasonable.[104] Accordingly, we refuse Sierra Club's request for injunctive relief.[105]

For the foregoing reason, the petition for review is dismissed without prejudice to renewal should circumstances so warrant.

*So ordered.*

---

**104.** In *PCHRG v. Auchter,* we found unreasonable a delay of three years from proposal to final rule, but we did so only because the statute mandated that the agency "give due regard to the urgency of the need" for the specific regulation in question, and because we were confident that an order expediting the proceedings would not "seriously disrupt other rulemakings of higher or competing priority." 702 F.2d at 1158. *Cf. In re Center for Auto Safety,* 793 F.2d at 1349–50 & n. 55 (presence of deadlines in the statute, combined with regulatory imperative to complete proceedings by fixed date, justify finding of unreasonable delay). As we have indicated in the text, such considerations are not present in the instant case.

**105.** No purpose would be served by retaining jurisdiction of this case.