The STATE of New York, Plaintiff,

v.

Ann GORSUCH, as Administrator of the United States Environmental Protection Agency, Defendant.

No. 81 Civ. 6678 (WCC).

United States District Court, S.D. New York.

Jan. 12, 1983.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for plaintiff; Marcia J. Cleveland, Mary L. Lyndon, James Periconi, Asst. Attys. Gen., New York City, of counsel.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for defendant; Gaines Gwathmey, III, Asst. U.S. Atty., New York City, Jose R. Allen, Atty., Dept. of Justice, Christopher C. Herman, Atty., E.P.A., Washington, D.C., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff the State of New York ("New York") brought this action against defendant the Administrator of the United States Environmental Protection Agency (the "EPA" or "Agency") pursuant to § 304(a)(2) of the Clean Air Act (the "Act"), 42 U.S.C. § 7604(a)(2),[1] seeking a declaration that the Administrator has failed to perform the nondiscretionary duty imposed upon her by § 112(b)(1)(B) of the Act, 42 U.S.C. § 7412(b)(1)(B), and an injunction requiring her to comply with that statute. By a consent order dated September 3, 1982, this Court entered partial summary judgment in plaintiff's favor declaring that defendant has violated her duty under § 112 of the Act. The order expressly left open the question of an appropriate remedy for the Administrator's failure to comply with the statutory mandate. The case is currently before the Court on New York's motion for summary judgment on the issue of a remedy and for an order enforcing the statutory timetable. For the reasons stated below, plaintiff's motion is granted.

*Background*

Five years ago, Congress enacted § 122 of the Act, 42 U.S.C. § 7422, which directed the Administrator, *inter alia,* to determine within one year whether airborne arsenic may reasonably be anticipated to endanger the public health. On June 5, 1980, almost two years later than she was required by Congress to make such a decision, the Administrator finally listed inorganic arsenic as a hazardous air pollutant pursuant to § 112(b)(1)(A) of the Act, 42 U.S.C. § 7412(b)(1)(A).[2] 45 Fed.Reg. 37886 (1980). By listing arsenic, the Administrator became subject to § 112(b)(1)(B) of the Act, 42 U.S.C. § 7412(b)(1)(B), which requires:

(B) Within 180 days after the inclusion of any air pollutant in such list, the Administrator *shall* publish proposed regulations establishing emissions standards for such pollutant together with notice of a public hearing within thirty days. Not later than 180 days after such publication, the Administrator *shall* prescribe an emission standard for such pollutant, unless he finds, on the basis of information submitted at such hearings, that such pollutant is clearly not a hazardous air pollutant. The Administrator *shall* establish any such standard at the level which in

---

1. This section provides:
   (a) Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

   . . . .

   (2) against the Administrator where there is alleged a failure to perform any act or duty under this chapter which is not discretionary with the administrator . . . .

2. This section requires the Administrator to "publish a list which includes each hazardous air pollutant for which he intends to establish an emission standard under this section."

his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant. (emphasis added).

In spite of this mandate, the Administrator has failed to publish any proposed regulations. Accordingly, the order entered by this Court on September 3, 1982 declared that the Administrator has failed to comply with her nondiscretionary duties under § 112 of the Act.

It is now more than two years beyond the date the Administrator was required to publish proposed regulations under § 112 of the Act, more than two and one-half years since inorganic arsenic was listed as a hazardous air pollutant, and almost five and one-half years since Congress ordered the Administrator to study immediately and, if warranted, to regulate promptly the emission of arsenic into the air. The question remains what remedy this Court should order for the Administrator's failure to heed Congress's directive.

*Legal Standard*

Summary judgment is appropriate only where the Court is satisfied that the moving party has met its burden of establishing that there exists no genuine issue with respect to any material fact and that it is entitled to judgment as a matter of law. Rule 56, F.R.Civ.P.; *Friedman v. Meyers,* 482 F.2d 435, 438–39 (2d Cir.1973). In making this determination, the Court cannot try issues of fact, but can only determine whether there are issues of fact to be tried. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). The Court will consider affidavits, depositions, answers to interrogatories, and admissions, but will not give any effect to mere conclusory allegations or denials, or to unsubstantiated assertions submitted by a party. The goal of this procedure is not to subjugate the rights of a party by requiring him to submit to trial by affidavit, but rather to weed out and dispose of unsupportable claims prior to

trial as a means of protecting the other party and the Court from further proceedings which can be little more than harassment. See *Feik v. Fleener,* 653 F.2d 69, 77 (2d Cir.1981); *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (2d Cir.1970).

*Discussion*

In support of its motion for an order resetting the statutory timetable,[3] New York argues quite straightforwardly that the Administrator has a nondiscretionary statutory duty, that she has failed to comply with it, and consequently, that she should now be required to fulfill her duty in compliance with the statutory time schedule, recommencing from the date of this Opinion and Order. The Administrator, on the other hand, claims that she is unable to promulgate the statutorily required regulations within the time frame established by Congress, and that therefore the Court should use its equitable powers to enter a remedial order allowing her additional time to complete her tasks.

It is indeed true that a grant of jurisdiction to the district courts to ensure compliance with a particular statute does not mechanically obligate a federal judge sitting as a chancellor in equity to grant an injunction for every violation of that law. *Weinberger v. Romero-Barcelo,* —— U.S. ——, ——, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *TVA v. Hill,* 437 U.S. 153, 193, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978). The essence of equity is the power of the chancellor to exercise flexibility and mold his decree to the necessities of the particular case. *Weinberger, supra,* —— U.S. at ——, 102 S.Ct. at 1802–03. An injunction is designed to deter, not to punish. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944). But, of course, Congress may, in an exercise of its constitutionally delegated powers, act to restrict or guide the court's discretion in a particular area. See *Weinberger, supra,* —— U.S. at —— – ——, 102 S.Ct. at 1803–04. If Con-

---

**3.** A resetting of the statutory timetable would require the Administrator to publish proposed regulations establishing emissions standards for inorganic arsenic within 180 days of the date of this Opinion and Order, and to prescribe emissions standards no later than 180 days after publication of those proposed standards.

gress formulates policies and programs to meet specific problems, it may also establish their relative priority for the Nation. *TVA v. Hill, supra,* 437 U.S. at 194, 98 S.Ct. at 2301–02. In such a situation, the court's role is to enforce the legislative will when called upon to do so. *Id.*

Thus, in *TVA v. Hill,* the Supreme Court concluded that Congress, in passing the Endangered Species Act, had made a clear decision to favor endangered species over competing concerns. That congressional determination, therefore, foreclosed the exercise of the usual discretion possessed by a court of equity and required the district court to act to enjoin the completion of the Tellico Dam in order to preserve the endangered snail darter, even though other considerations favored completion of the dam. *Id.* at 194, 98 S.Ct. at 2301; see *Weinberger, supra,* —— U.S. at ——, 102 S.Ct. at 1804. In so holding, the Court stated:

> Here we are urged to view the Endangered Species Act "reasonably" and hence shape a remedy "that accords with some modicum of common sense and the public weal." But is that our function? We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam. Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it describes as "institutionalized caution."
>
> Our individual appraisal of the wisdom or unwisdom of a particular course selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto.

*TVA v. Hill, supra,* 437 U.S. at 194–95, 98 S.Ct. at 2302 (citation omitted). This same principle of deference to a clearly expressed congressional preference is applicable in the instant case.

■ In enacting the Clean Air Act, Congress expressly stated that one of the purposes of subchapter I of the Act is "to initiate and *accelerate* a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(2) (emphasis added). Section 112, which imposes the strict timetable on the Administrator, is an integral part of that subchapter.

Moreover, the legislative history of the 1970 Amendments to the Act, Pub.L. 91–604, in which these deadlines were established, clearly demonstrates the importance Congress attached to the time limitations for agency action. When passing the bill, the House reported its concern that past strategies designed to combat air pollution "have been inadequate in several important respects, and *the methods employed in implementing those strategies often have been slow and less effective than they might have been.*" House Report 1146, *reprinted in* 1970 U.S.Cong. & Ad.News 5356, 5356 (emphasis added). The strict deadlines for EPA action included in § 112 were not the inadvertent product of uninformed congressional action, but were the deliberate result of a studied effort by a joint congressional conference. See Conference Report 1783, *reprinted in id.* 5374, 5378–79. Thus, it is clear that Congress expressly considered and concluded that a specific timetable was necessary to ensure a more expeditious and effective cleanup of this Nation's air. To ignore or modify the statutory timetable would be to flout the considered judgment of Congress. This I refuse to do.

In addition to the general desire for a speedy cleanup of the air, the 1977 Amendments to the Act, Pub.L. 95–95, express Congress's specific concern with the potentially disastrous environmental effects of arsenic. In support of its directive to the Administrator to consider regulating arsenic, 42 U.S.C. § 7422, Congress recited considerable scientific evidence concerning the carcinogenic properties of the chemical and the unreasonably dangerous risk it poses to

human health. See 1977 U.S.Cong. & Ad. News at 1116–17. In directing the Administrator to act on arsenic within one year, see 42 U.S.C. § 7422, Congress was motivated, *inter alia,* by a desire "to assure that regulatory action can effectively prevent harm before it occurs; to emphasize the predominant value of protection of human health." 1977 U.S.Cong. & Ad.News at 1127. And, despite the Administrator's contention to the contrary, in ordering the EPA to respond promptly, Congress was fully cognizant that there would exist limitations on and uncertainties in the data available to the Administrator when she would be required to act. See *id.* at 1128. Surely Congress was aware that perfect regulatory standards could not be developed in so short a period of time. But so too must it have appreciated that whatever levels were promulgated initially by the Administrator could be amended should later studies demonstrate that a different level is more appropriate in light of the technological realities.

The legislative history and statements of purpose thus unequivocally demonstrate that Congress sought to ensure prompt regulation and control of air pollution. The deadlines imposed, when viewed against the various statements of purpose, show simply that Congress concluded that prompt, though imprecise, regulations were preferable to no regulations during the period while further studies were being conducted to provide the Administrator with more complete information. Against this clear articulation of legislative intent, it is unseemly for the Administrator to assert that she is vested with the discretion to balance the need for prompt regulation against the need for informed standards. This is a balance that has already been struck by Congress in favor of allowing a 180-day period for promulgation of proposed regulations, along with other definite time limits for further action. If Congress wanted to leave the Administrator with the flexibility to implement regulation based upon her own judgment of the most desirable time schedule, it obviously knew how to do so. Clearly, however, it did not. It is, therefore, incumbent upon the Administrator to establish promptly some guidelines, however general, for the regulation of inorganic arsenic emissions.

The Administrator, however, argues that courts always recognize administrative impossibility as a ground to relieve the agency from a firm duty imposed by Congress. The genesis of this doctrine is in the maxim that a court will not exercise its equity powers to compel one to do that which is impossible. See *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C.Cir.1975). But whatever may be the scope of this "impossibility" exception, it does not embrace the instant circumstances.

In discussing the exception, the Court of Appeals for the District of Columbia Circuit stated:

> We perceive two types of constraints which might delay the formulation of adequate guidelines for some few categories of point source beyond the deadline established by the Act. . . . Second, EPA may be unable to conduct sufficient evaluation of available control technology to determine which is the best practicable or may confront problems in determining the components of particular industrial discharges. The courts cannot responsibly mandate flat guideline deadlines when the administrator demonstrates that additional time is necessary to insure that the guidelines are rooted in an understanding of the relative merits of available control technologies.

*Train, supra,* 510 F.2d at 712.

See *Alabama Power Co. v. Costle,* 636 F.2d 323, 359 (D.C.Cir.1979). The same court, however, went on to state:

> An equity court can never exclude claims of inability to render absolute performance, but it must scrutinize such claims carefully since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience.

510 F.2d at 712.

The burden of justification in such a case is especially heavy. *Alabama Power, supra,* 636 F.2d at 359.

Without questioning the merits of the "impossibility" exception carved out in the District of Columbia Circuit,[4] I must conclude that the Court is unable to relieve the Administrator of her duty under such an exception in this instance. To do so would be to grant her unbridled discretion to administer the Clean Air Act according to her own time schedule, regardless of specific congressional directions to the contrary.

The Administrator argues, however, that the question whether she is actually capable of complying within the statutory period remains a disputed issue of fact, thereby making summary judgment inappropriate in this case. Under her analysis, this issue must be resolved at a hearing before the Court can enter any remedial order. The Administrator has documented for the Court the steps her Agency is currently taking in an attempt to develop emissions standards for arsenic. In his deposition, David Patrick, Chief of the Pollutant Assessment Branch in the Strategies and Air Standards Division of the EPA, described a study conducted by the Radian Corporation which he hoped would put the Agency in a position by April 1983 to *begin* to develop proposed emissions standards for high priority source categories. See Patrick Deposition at 72–73. Thus, under the Agency's timetable, in April 1983 the Administrator will begin to develop standards which Con-

gress instructed her to have published in proposed form no later than December 5, 1980.[5] I fail to understand how the Court can countenance such a delay.

Moreover, Mr. Patrick stated further in his deposition that the Agency commissioned the Radian study because it wanted to be "more confident" of the priorities it established. See Patrick Deposition at 72. The purpose of the delay attendant upon the further study was to give the Agency the "best information possible" to make the determination of what the standards should be. See *id.* at 75. While the Administrator should be commended for striving to develop the fullest possible statistical basis for any regulations she promulgates, that quest must give ground in favor of expedition where Congress expressly directs the Administrator to establish standards promptly. It is clear from the statements of Mr. Patrick and also from the remarks of Stanley T. Cuffe, head of the Industrial Studies Branch of the EPA, that although the Agency is fully capable of developing some emissions standards within the congressionally allotted time period, it wants additional information in order to be more confident that the standards it develops will from the beginning be both legally and technologically justifiable. See *id.* at 80–81; Cuffe Deposition at 41–44.

---

4. The language used by the District of Columbia Circuit, albeit dictum, is susceptible of a very expansive interpretation. In *Train,* the Court stated that, "[w]e think that the court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities." 510 F.2d at 713. While I do not believe that "good faith" is really an appropriate measure of an administrator's compliance, it can, perhaps, provide a workable standard if it is applied very strictly. Quite simply, an administrator charged with violating his duties under a statute must be able to demonstrate that he is completely unable to fulfill his duties in order for a court to consider withholding its injunction. If the administrator could possibly have complied with the statutory mandate, but did not because of competing concerns or other decisions on his part, then he is not acting in "good faith" as I would use that term in this area. Although an administrator is

thought to possess a great deal of expertise concerning the area within his regulatory control, and often he is afforded broad discretion concerning the implementation of programs in that area, he cannot be permitted to substitute his own wisdom for the determination of Congress, unless Congress has given him leave to do so. That is not "good faith." The Administrator's showing in the instant action cannot come within the scope of this exception, even assuming the truth of statements contained in the affidavits.

5. Since inorganic arsenic was listed on June 5, 1980 by the EPA, proposed regulations were required to be published no later than December 5, 1980 pursuant to § 112(b)(1)(B) of the Act. Moreover, if the EPA had listed arsenic initially within the time period allowed by § 122 of the Act, then those regulations would have been due some two years earlier.

I suggest that this evidence does not demonstrate "impossibility," but rather a difference in rulemaking philosophy from that evinced by Congress. Thus, these depositions fail to raise an issue of fact that precludes the granting of a remedial order in this procedural context. While in the normal instance I would defer to the wisdom of the Administrator, I cannot when Congress has so clearly spoken on the issue. If the Administrator disagrees with the burden Congress has imposed upon her Agency, her proper recourse is to persuade Congress to amend the statute, not to defy the statute and seek relief from the courts. Accordingly, I find that the Administrator should be compelled to comply with the statutory mandate.

My conclusion in this regard is directly supported by the recent decision in *Sierra Club v. Gorsuch,* 551 F.Supp. 785 (N.D.Calif. 1982). In *Sierra Club,* on facts virtually identical to those at issue here, the court ordered the Administrator to publish proposed emissions standards for radionuclides within 180 days. *Id.,* at 789. The EPA had listed radionuclides as a hazardous air pollutant under § 112(b)(1)(A) of the Act on November 8, 1979, yet had failed to issue any proposed emissions standards as mandated by § 112(b)(1)(B). The court summarily rejected the Administrator's contentions that the long delay was necessary and that compliance with the statute was difficult or impossible, and concluded:

> To accept the EPA's proposal for further, indefinite, and virtually open-ended extension [sic] of time for compliance, without a more convincing demonstration of evident impossibility, would be to, in effect, repeal the Congressional mandate. Further, to substitute the Court for making scientific determinations for which the Court has neither the investigative tools, nor expertise, and, further, to grant an extension such as required by the EPA, would involve the Court, rather than Congress, in changing, qualifying, or amending, if advisable, the unqualified mandatory provisions of Section 7412. Such relief, as sought by EPA should

come from the Congress—not from the Courts.

*Id.* at 789.

This reasoning is equally applicable in the instant situation.

Moreover, an important, but often overlooked, provision of the regulatory process is that once the EPA publishes the proposed regulations, the public is given the opportunity to comment upon them and to offer suggestions for their improvement. See 42 U.S.C. § 7412(b)(1)(B). The importance of public comment to the development of informed regulations should not be underestimated, nor should it be undermined by the Administrator's delay in carrying out her duties. The availability of such a practical check on the regulatory process supports the result reached here.

*Conclusion*

Just as a district court's equity powers can be restricted in a particular situation by clear congressional action, so too can the Administrator's manner of implementing a specific legislative policy be constrained by the directions in the congressional enactment. *Cf. TVA v. Hill, supra,* 437 U.S. at 194, 98 S.Ct. at 2301 (executive branch has job of administering laws consistently with congressionally established priorities). In enacting §§ 112 and 122 of the Act, Congress gave the Administrator an unconditional mandate. Thus, for the reasons stated above, plaintiff's motion for summary judgment and the entry of a scheduling order is granted. Defendant is hereby ordered to publish, within 180 days of the date of this Opinion and Order, proposed regulations establishing emissions standards for inorganic arsenic, together with a notice of public hearing thereon, as required by § 112 of the Act, 42 U.S.C. § 7412. The Administrator is further ordered to file with the Court on that date a report detailing her compliance with this Order.

SO ORDERED.