**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

**AMERICAN PETROLEUM INSTITUTE, et al., Plaintiffs,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

**Civ. A. Nos. 83–2011, 83–2951.**

United States District Court, District of Columbia.

Sept. 14, 1988.

Angus Macbeth, Monica A. Schwebs, Sidley & Austin, David D. Doniger, Natural Resources Defense Council, Inc., Washington, D.C., for plaintiffs.

Stephen L. Samuels, Land and Natural Resources Div., Dept. of Justice, Earl Salo,

Ralph J. Colleli, Jr., Office of Gen. Counsel, U.S.E.P.A., Washington, D.C. (Francis S. Blake, Gen. Counsel, Alan W. Eckert, Associate Gen. Counsel, U.S.E.P.A., of counsel), for defendants.

Neil Jay King (David F. Zoll, Kathy Bailey, Chemical Mfrs. Assn., of counsel), Arthur F. Sampson, III, Kirkland & Ellis (G. William Frick, Arnold S. Block, American Petroleum Institute, of counsel), Washington, D.C., for intervenors.

John L. Wittenborn, Collier, Shannon, Rill & Scott, Washington, D.C., for Gasoline Marketers.

## OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on plaintiffs Natural Resources Defense Council, Inc. and Environmental Defense Fund, Inc.'s ("NRDC")[1] motion for partial summary judgment and two motions to dismiss filed by defendants, the United States Environmental Protection Agency ("EPA") and its Administrator. The parties also filed their respective oppositions and supplemental briefs which were joined by several intervenors[2] during the course of this litigation. For the reasons set forth below, the Court grants in part and denies in part plaintiffs' motion for partial summary judgment and grants in part and denies in part defendants' two motions to dismiss.

1. The plaintiffs in Civil Action No. 83–2011 are Natural Resources Defense Council, Inc. and Environmental Defense Fund, Inc. ("NRDC"), two nonprofit environmental protection organizations. On October 4, 1983, the American Petroleum Institute ("API") filed a separate and closely parallel action, Civil Action No. 83–2951, in this Court. API is a national trade association of the petroleum industry which represents over 300 companies and over 7,500 individuals. By stipulation, the parties in both Civil Action Nos. 83–2011 and 83–2951 agreed to consolidate these suits for the purposes of discovery, motion practice, and hearing or trial. *See* Stipulation filed on November 29, 1983.

2. On behalf of its member companies, API and six API member companies, including Atlantic Richfield Company, Gulf Oil Corporation, Shell Oil Company, Standard Oil Company (Indiana),

## I. *Background*

In 1977, in recognition of its known carcinogenic effects, then-EPA Administrator William D. Ruckelshaus listed benzene as a hazardous air pollutant pursuant to section 112(b)(1)(A) of the Clean Air Act (the "Act"), 42 U.S.C. § 7412(b)(1)(A). 42 Fed. Reg. 29,332 (1977). Benzene is a constituent of gasoline vapors and gasoline vapors as a whole are carcinogenic. *Id.* Under the Act, once the EPA determines that a pollutant such as benzene poses a health risk, it is required to issue proposed emission standards within 180 days of listing the pollutant. 42 U.S.C. § 7412(b)(1)(B).

The EPA did not issue the proposed regulations within the timetable prescribed by statute and on July 14, 1983, plaintiff NRDC filed its original complaint seeking an order to compel the EPA to propose or promulgate emissions standards for several stationary sources of benzene under section 112 of the Act. Standards for several categories of benzene emissions sources had been proposed but no final regulations as to these categories were ever promulgated. Furthermore, proposed regulations had not been issued as to several remaining categories of benzene emissions sources.

On November 11, 1983, plaintiffs filed a motion for partial summary judgment with respect to the EPA Administrator's duty to promulgate standards for four categories of sources of benzene emissions: (1) maleic anhydride process units; (2) ethylbenzene/styrene process units; (3) benzene

Standard Oil Company (Ohio), and Texaco Inc., intervened as plaintiffs in Civil Action No. 83–2011 on September 7, 1983. The Court will refer to these intervenors collectively as "API."

The Chemical Manufacturers Association ("CMA") also intervened as a plaintiff on September 15, 1983. CMA is a nonprofit trade association whose member companies represent more than 90 percent of the production capacity for basic industrial chemicals in the United States.

The Court granted an unopposed motion for intervention as defendants by the National Association of Convenience Stores, the National Oil Jobbers Council, and the Society of Independent Gasoline Marketers of America (the "Gasoline Marketers") on September 2, 1983. The Gasoline Marketers are trade associations comprised of companies which store, transport, distribute and sell gasoline at retail.

storage tanks, and (4) fugitive benzene emissions, and to propose a standard for coke oven by-product recovery plants. Plaintiffs limited the motion to these five categories because the Administrator had already issued proposed regulations for four of these categories and a proposed regulation had been readied, though not issued, for the fifth category.

This Court granted plaintiffs' motion on January 27, 1984, and ordered additionally that the EPA defendants publish notice of the promulgated or proposed standard(s) or its decisions that those actions would not be taken. EPA complied with the Court's order and published its decisions in the *Federal Register* on June 6, 1984. EPA proposed a standard for coke oven by-product recovery plants, prescribed a final standard for fugitive benzene emissions, and withdrew the proposed standards for maleic anhydride process units, ethylbenzene/styrene process units, and benzene storage tanks. 49 Fed.Reg. 23,478, 23,498, and 23,558 (1984). The proposed standards for maleic anhydride process vents, ethylbenzene/styrene process vents, and benzene storage vessels were withdrawn "based on the conclusion that both the benzene health risks to the public from these source categories and potential reductions in health risks achievable with available control techniques [were] too small to warrant Federal regulatory action under section 112." *Id.* at 23,494.

Plaintiffs then moved for leave to amend their complaint in this Court under section 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2), to allege that the Administrator of the EPA had failed to perform certain nondiscretionary duties under section 202(a)(6) of the Act, 42 U.S.C. § 7521(a)(6), with respect to requiring onboard emissions controls[3] for motor vehicles which are a source of benzene emissions. Plaintiffs argued that EPA never made a final decision as to this issue. In addition, plaintiffs sought an order compelling the Administrator, within the specified time frame embodied in section 112 of the Act, to propose emission standards with respect to a variety of additional source categories, including eight types of chemical manufacturing process units and other forms of benzene usage, and three elements of the gasoline marketing system. The eight types of chemical manufacturing process units and benzene usage are: ethylene plants, chlorobenzene plants, nitrobenzene plants, linear alkyl benzene plants, cyclohexane, waste disposal from chemical manufacturing, refinery waste disposal, and industrial solvent usage. The three elements of the gasoline marketing system are bulk terminals, bulk plants, and service stations. The Court granted plaintiffs' motion to amend the complaint.

Subsequently, defendants filed their first motion to dismiss which is pending before this Court. When this motion was filed initially, defendants sought dismissal of ¶¶ 4, 5, 21, 11, and 26, and ¶ 4 of the Prayer for Relief of plaintiffs' amended complaint on the grounds of lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted, under Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. According to defendants, the claims alleged in these specific paragraphs of plaintiffs' amended complaint warrant dismissal because section 202(a)(6) of the Act does not impose a nondiscretionary duty on the Administrator

---

**3.** Approximately 90 percent of all refueling emissions consist of vapors displaced from the vehicle fuel tank by incoming gasoline. 52 Fed. Reg. 31,164 (1984). There are two basic alternatives for the control of refueling emissions, "Stage II" and "onboard." Stage II equipment is installed at the service station while onboard equipment is installed in the vehicle. This case involves the latter, thereby necessitating a short description of this system for the sake of clarity.

Onboard systems function during the refueling of an automobile by sealing the vehicle fillneck, then routing the displaced vapor from the fuel tank to a storage canister. This canister is loaded with granules of activated carbon, and the hydrocarbon molecules in the vapor are absorbed onto the surfaces on these granules. When the vehicle's engine is started, fresh (ambient) air is drawn through the canister to desorb or purge the hydrocarbons from the activated mixture. The resulting mixture of air and hydrocarbon vapors is transferred to the fuel metering system and burned in the engine. Gasoline vapors that would normally be lost to the atmosphere are used instead to power the vehicle. *Id.* at 31,173.

to determine the feasibility and desirability of requiring onboard emissions controls for new motor vehicles by a specific date. Even if such a duty were imposed by section 202(a)(6), defendants argue that they already discharged it in 1981 when the Administrator published a decision not to require onboard controls under the Act. 46 Fed.Reg. 21,628, 21,629 (1981). Intervenor-plaintiff API supported this motion to dismiss because "the far broader relief sought [by NRDC] in the Amended Complaint does not state a cause of action under section 304 of the Act, 42 U.S.C. § 7604." Memorandum of the American Petroleum Institute, *et al.* in support of EPA's Motion to Dismiss filed on November 29, 1984, at 1–2.

Plaintiffs then filed a second motion for partial summary judgment on the remaining issues in this case which sought initially an order requiring defendants, (1) within three months of entry of such order, to make a final determination pursuant to section 202(a)(6) of the Act regarding whether onboard and/or stationary controls would be utilized to regulate emissions of benzene and/or other hydrocarbons in the gasoline marketing system; (2) within three months thereafter to propose standards for regulating benzene and/or other hydrocarbons in the gasoline marketing system (or announcing that no regulation would be imposed) pursuant to section 112 or 202(a)(6) of the Act; (3) within six months thereafter to issue final standards for regulating benzene and/or other hydrocarbons in the gasoline marketing system; (4) within six months of entry of such order to propose a standard for emissions of benzene from chemical manufacturing process units and other forms of industrial benzene usage (or announcing that no regulation would be imposed), pursuant to section 112 of the Act; and (5) within six months thereafter to issue a final standard for emissions of benzene from chemical manufacturing process units and other forms of industrial benzene usage.

Next, defendants filed their second motion to dismiss and opposition to plaintiffs' motion for partial summary judgment. Unlike their first motion to dismiss which was directed solely at plaintiffs' claims con-cerning onboard controls of benzene emissions controls on new motor vehicles, this motion requested dismissal of plaintiffs' claims regarding defendants' alleged non-discretionary duties under section 112 of the Act to propose and promulgate emission standards for benzene emissions for the gasoline marketing system and chemical manufacturing process units and other forms of industrial benzene usage.

Defendants cited four basic grounds for their motion to dismiss. First, they argued that EPA had no nondiscretionary duty under section 112 to propose and promulgate the benzene emission standards sought by plaintiffs; therefore, the complaint should be dismissed for lack of subject matter jurisdiction. Second, defendants claimed that plaintiffs' complaint raised the basic legal question of whether EPA could regulate some source categories of benzene and not others within the time frame set forth in section 112. According to defendants, that very issue was pending before the United States Court of Appeals for the District of Columbia as part of various challenges of EPA's rulemaking notice of June 6, 1984, and they requested that this Court defer its judgment so that the appeals court could address this basic issue of statutory interpretation. Third, defendants argued that defendants failed to identify with particularity what the "other forms of industrial benzene usage" were in either its initial or amended complaint; therefore, those claims are not properly before the Court. Finally, even if all of defendants' claims were before the Court properly, defendants averred that summary judgment should not be granted because there would remain disputed issues of material fact related to the time schedule proposed by plaintiffs.

Without considering the full merits, this Court transferred this case to the United States Court of Appeals for the District of Columbia pursuant to 28 U.S.C. § 1631 (1982) and in light of the holding in *Telecommunications Research & Action Center v. FCC* ("TRAC"), 750 F.2d 70 (D.C.Cir. 1984). At the time of the transfer, this Court determined that plaintiffs' complaint

presented basically two issues for resolution: (1) whether section 112 of the Clean Air Act imposes a mandatory duty upon the EPA Administrator to propose and promulgate standards for all source categories of benzene emissions, including chemical manufacturing process units and the gasoline marketing system, and (2) whether the EPA Administrator fulfilled his duty under section 202(a)(6) of the Act when he announced in the *Federal Register* on April 15, 1981, that onboard vehicle controls would not be required. *Natural Resources Defense Council, Inc. v. EPA*, No. 83–2011, slip op. at 7 (D.D.C. Oct. 15, 1985). As to the latter issue, this Court determined that EPA had satisfied its duty under section 202(a)(6) on April 15, 1981, when it decided not to require onboard emission controls. *Id.* at 14. The first issue remained undecided.

Upon consideration of the transfer and the parties' claims, the Court of Appeals retransferred this case. *Natural Resources Defense Council, Inc. v. EPA*, No. 86–1010, slip op. at 1 (D.C.Cir. May 5, 1987). It found that the relief sought by plaintiffs, a court order compelling the Administrator of EPA to fulfill an alleged nondiscretionary duty imposed by section 112(b)(1)(A) of the Act, is obtainable only under section 304 of the Act, 42 U.S.C. § 7604. Section 304 vests original jurisdiction in the district courts to determine whether the Administrator has failed to perform "any act or duty under this chapter which is not discretionary." The Court of Appeals determined further that "because *TRAC* was premised on the absence of a congressional grant of jurisdiction to the district courts ... [it] is inapposite where Congress has explicitly vested district courts with original jurisdiction over a particular class of claims." *Id.* Accordingly, it concluded that the transfer of this case was improper.

After the retransfer, the parties submitted supplemental briefings in support of their various motions and to bring the Court up to date with the posture of the case. With one exception, no significant changes have occurred and the parties' positions remain the same. On August 19, 1987, the EPA Administrator changed his decision regarding onboard emissions controls and EPA proposed to control gasoline vapors, including benzene, from the last step of the gasoline marketing system—the refueling of motor vehicles. 52 Fed.Reg. 31,162 (1987). According to the Administrator, "[t]his proposal would reduce emissions of gasoline refueling vapors by nearly 90 percent from uncontrolled levels." *Id.* at 31,162. Plaintiffs contend that this action by defendants did not fully discharge their statutory obligation since it was only a proposal pursuant to section 202(a)(6) of the Act and effectively a proposal to satisfy obligations under section 112. They contend that the deadlines set forth in section 112 are applicable; therefore, EPA had a nondiscretionary duty to take final action on its proposal within 180 days, that is by February 15, 1988. Since no such action was taken, plaintiffs still seek an order from this Court directing defendants to meet their alleged statutory obligations.

## II. *Discussion*

Section 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2), provides that any person may commence a civil action in district court "against the Administrator [of EPA] where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." This section is known generally as the "citizen suit" provision. "[C]ongress provided for district court enforcement under section 304 in order to permit citizen enforcement of 'clear-cut violations by polluters or defaults by the Administrator' where the only required judicial role would be to make a clear-cut factual determination of whether a violation did or did not occur." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C.Cir.1987) (footnote omitted). "In order to impose a clear-cut nondiscretionary duty, ... a duty of timeliness must 'categorically mandat[e]' that *all* specified action be taken by a date-certain deadline." *Id.* (footnote omitted and emphasis in cited case). In those instances, "the only question for the district court to

answer is whether the agency failed to comply with that deadline." *Id.*

The citizen suit filed by plaintiffs and the various motions filed by both sides seek a determination by this Court as to whether the Administrator has performed his non-discretionary duty with regard to benzene emission standards. The papers of the parties present two issues involving this non-discretionary duty: first, whether section 112(b)(1)(B) of the Act imposes a nondiscretionary duty upon the EPA Administrator either to propose emission standards for the remaining source categories of benzene in the chemical manufacturing process units and other forms of benzene usage and the three elements of the gasoline marketing system within the timetable prescribed under section 112(b)(1)(B) of the Act, or to announce that no regulation will be proposed, and second, whether the timetable prescribed under section 112(b)(1)(B) of the Act is applicable to action taken pursuant to section 202(a)(6) of the Act, thereby imposing a nondiscretionary duty upon the EPA Administrator to take final action within 180 days of its August 19, 1987 proposal regarding onboard emissions control.

## A. *Section 112*

Section 112 of the Clean Air Act provides for regulation of hazardous air pollutants, which the statute defines as "air pollutant[s] to which no ambient air quality standard is applicable and which in the judgment of the Administrator cause[ ], or contribute[ ] to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 7412(a)(1) (1982). Under the statute, the Administrator is required to publish a list containing each hazardous pollutant for which he intends to adopt an emission standard. 42 U.S.C. § 7412(b)(1)(A). The statute also requires the Administrator, "within 180 days after the inclusion of any air pollutant in such list [to] publish *proposed* regulations establishing emission standards for such pollutant together with a notice of public hearing within thirty days." 42 U.S.C.

§ 7412(b)(1)(B) (emphasis added). "Not later than 180 days after such publication, the Administrator shall *prescribe* an emission standard for such pollutant, unless he finds on the basis of information presented at such hearings, that such pollutant is clearly not a hazardous air pollutant." *Id.* (emphasis added). The statute then directs the Administrator to set an emission standard promulgated under section 112 "at the level which in his judgment provides an ample margin of safety to protect the public health." *Id.*

Plaintiffs interpret section 112 as to require the EPA Administrator to either propose regulations establishing emission standards for all remaining source categories of benzene emissions within the time frame established by section 112 or make a final determination as to each category that no regulations will be proposed. EPA has not proposed or promulgated *any* emission standards for several source categories of benzene which include eight types of chemical manufacturing process units and benzene usage and three elements of the gasoline marketing system. Plaintiffs request that the Court compel the EPA Administrator to take action pursuant to section 112(b)(1)(B) with regard to these source categories of benzene.

Defendants EPA and its Administrator contend that plaintiffs read section 112 too broadly. They state that section 112(b)(1)(B) requires the EPA Administrator to "prescribe *an emission standard*" only for a pollutant listed pursuant to section 112(b)(1)(A) and he has already done this by promulgating standards for fugitive emissions. Supplemental Brief of Defendant United States Environmental Protection Agency ("Defendant's Supplemental Brief") at 11. According to defendants, "[s]ection 112 does not state or even imply that [the] EPA [Administrator] must promulgate a standard (or standards) specifically applicable to each and every source of the pollutant [in this case, benzene]." *Id.* at 11–12. Moreover, defendants aver that "[the Administrator's] determination of the appropriate scope of benzene standards necessarily involves the ex-

ercise of discretion." *Id.* at 12. Since Congress provided specifically that the Administrator determine which emission level in his judgment protects the public health, any decision which by necessity requires the exercise of this degree of discretion cannot be considered nondiscretionary. *Id.*

To further support their contentions, defendants point to every instance in which EPA has promulgated an emission standard under section 112. In each instance, defendants argue, every emission standard was limited to certain specified emission sources. *See* 40 C.F.R. Part 61, Subparts B, H, I, and K (standards for radionuclides); Subparts C and D (beryllium); Subpart E (Mercury); Subpart F (vinyl chloride); Subpart M (asbestos); 51 Fed.Reg. 27,956 (1986) (inorganic arsenic) (to be codified at Subpart N).[4]

Furthermore, defendants cite this Court's order of January 27, 1984, to buttress their position. As noted by the defendants, that order did not direct EPA to regulate all sources or any particular source of benzene. Instead, it only ordered EPA to promulgate standards for the four source categories of benzene for which EPA had already proposed standards and to propose a standard for a fifth category which had been identified previously by EPA. *See* Order of January 27, 1984, at 2. Because EPA does not have a mandatory duty to regulate every benzene source, defendants assert that this Court lacks jurisdiction over plaintiffs' request for relief under section 304(a)(2) of the Act and that portion of plaintiffs' complaint should be dismissed.

When Congress enacted the Clean Air Act, it stated expressly that two of the purposes of subchapter I of the Act were "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. §§ 7401(b)(1), (b)(2). Section 112 is an integral part of subchapter I and "[e]very action by the Administrator in setting an emission standard is to be taken 'to protect the public health.'" *Natural Resources Defense Council v. EPA*, 824 F.2d 1146, 1163 (D.C.Cir.1987).

With this in mind, the Court finds nonsensical the EPA's reading of section 112(b)(1)(B). Taken out of context, section 112(b)(1)(B) could be read literally to mean that the EPA Administrator need only propose *a single* emission standard for each hazardous pollutant in order to comply with the mandates of the Clean Air Act. However, when placed in its proper context and considered with the stated purposes of the Act, and subchapter I in particular, it becomes clear that EPA's interpretation of section 112(b)(1)(B) is unreasonable. Under EPA's reading of the Act as applied to the instant matter, the single standard promulgated for fugitive benzene emissions from equipment leaks under section 112, would satisfy the requirements of the Act. This result would be anomalous indeed since fugitive benzene emissions account for a mere 14 percent of benzene emissions from stationary sources. 49 Fed.Reg. 23,478 (1984).[5] Certainly, Congress did not intend

**4.** For example, the standard for radionuclides does not cover coal-fired boilers, the phosphate industry, and other extraction industries. 49 Fed.Reg. 43,906 (1984). The beryllium standard does not cover certain beryllium alloy machining operations. 38 Fed.Reg. 8,823 (1973). The vinyl chloride standard does not cover polyvinyl chloride fabricating plants and some other sources. 40 Fed.Reg. 59,534 and 59,535 (1975); 41 Fed.Reg. 46,562 (1976). The asbestos standard does not cover asbestos mines, asbestos dumps and open storage areas, or asbestos fabrication operations. 38 Fed.Reg. 8,821 (1973). Finally, the arsenic standard does not cover primary and secondary lead smelters, primary zinc smelters, zinc oxide plants, cotton gins or

arsenic chemical manufacturing plants. 51 Fed.Reg. 27,956 (1986).

**5.** The 14 percent figure is derived from statistics published by EPA in a *Federal Register* notice at 49 Fed.Reg. 23,478 (1984). The total of all fugitive benzene emissions from equipment leaks at the time this source category was regulated was 7,900 Mg/yr. *Id.* at 23,492. The total of all benzene emissions from stationary sources at that time was 55,000 Mg/yr. *Id.* at 23,478. Thus, fugitive benzene emissions from equipment leaks accounted for 7,900 out of 55,000 amg/yr. of benzene emissions from stationary sources or 14 percent.

such a result in its efforts "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

Moreover, the Court questions the sincerity of EPA's position regarding section 112(b)(1)(B) in light of the rationale behind its recent request for voluntary remand in *Natural Resources Defense Council v. Thomas*, Nos. 84–1387 and consolidated cases ("*Thomas* case"). The *Thomas* case involved challenges in the United States Court of Appeals for the District of Columbia Circuit by NRDC of then-EPA Administrator Ruckelshaus' decision to promulgate standards for fugitive benzene emissions and to withdraw proposals for maleic anhydride process vents, ethylbenzene/styrene process vents, and benzene storage vessels. After the Court of Appeals rendered its decision in *Natural Resources Defense Council v. EPA*, 824 F.2d 1146 (D.C.Cir. 1987) (*en banc*) (the vinyl chloride case), EPA moved for voluntary remand of its final actions on these four categories of benzene sources. If EPA truly believed that it had discharged its duty under section 112(b)(1)(B) by promulgating standards for fugitive emissions alone, it would not now be reconsidering its decisions on the three previously withdrawn benzene proposals. Obviously, EPA's unreasonable position regarding section 112(b)(1)(B) has been assumed merely for the purpose of this litigation.

The Court must next address NRDC's contention that section 112(b)(1)(B) of the Act requires defendants *to propose* an emission standard for every source category of benzene emissions within 180 days of listing benzene as a hazardous pollutant, or make a determination that no such action will be taken. In order to answer this question, the Court must conduct a two-part analysis. The Court must first decide whether section 112(b)(1)(B) requires EPA to propose an emission standard for every source category of benzene emissions, or at least determine whether such a proposal should issue, and then it must determine whether either of these actions must be performed within 180 days of the listing of benzene. These are two separate issues.

In effect, NRDC's interpretation of section 112(b)(1)(B) requires EPA to take some type of affirmative action with respect to every stationary source of benzene emissions in order to comply with the mandate and purposes of the Clean Air Act. This notion is a reasonable one. EPA has a sorry record of not acting in conformance with the Act despite its stated purposes. This matter is one of many instances where EPA has disregarded the spirit and letter of the Clean Air Act and chosen instead to drag its feet in discharging its duty to protect the health of the American public. While the Court agrees with EPA that a plain reading of section 112(b)(1)(B) does not require it to propose emission standards for *all* remaining sources of benzene emissions, whether major or minor, the Court finds that EPA must make a final decision either to propose a standard for those source categories of benzene where it deems such action appropriate, or issue a final determination as to why a source of benzene emissions will not be regulated.

As for the time frame in which EPA must act, the Court finds that section 112(b)(1)(B) imposes a strict timetable with which EPA and its Administrator must comply. Without a doubt, Congress was aware of the relatively short period of time it had afforded the defendants in which to act when it enacted section 112(b)(1)(B). Nonetheless, it chose to do so in light of the overwhelming importance of the goals and purposes of the Act. "[T]he legislative history of the 1970 Amendments to the Act, Pub.L. 91–604, in which [section 112] deadlines were established, clearly demonstrates the importance Congress attached to the time limitations for agency action." *State of New York v. Gorsuch*, 554 F.Supp. 1060, 1063 (S.D.N.Y.1983). As noted by the court in *Gorsuch*, "[w]hen passing the bill, the House reported its concern that past strategies designed to combat air pollution 'have been inadequate in several important respects, and *the methods employed in implementing those strategies often have been slow and less effective*

*than they might have been.'*" *Id.* (quoting H.R.Rep. No. 1146, 91st Cong., 2d Sess. 1, *reprinted in* 1970 U.S.Code Cong. & Admin.News 5356 (emphasis added in cited case)). The deadlines contained in section 112 "were not the inadvertent product of uninformed congressional action, but were the deliberate result of a studies effort by a joint congressional conference." *Id.* (citing H.R.Conf.Rep. No. 1783, 91st Cong., 2d Sess. 42, 45–47, *reprinted in* 1970 U.S. Code Cong. & Admin.News 5374, 5378–79).

■ In light of the foregoing, the Court finds specifically that section 112(b)(1)(B) does not impose a nondiscretionary duty on the Administrator to propose emission standards for every remaining source category of benzene. The Court does find, however, that EPA has a nondiscretionary duty under section 112(b)(1)(B) to issue a final determination, either a proposal to regulate or a notice of intention that a source will not be regulated, as to each remaining source category of benzene emissions within the timetable prescribed. Accordingly, the Court grants plaintiffs' motion for partial summary judgment as to this issue, and denies defendants' motion to dismiss filed on December 21, 1984.

### B. *Section 202(a)(6)*

Section 202(a)(6) of the Act, 42 U.S.C. § 7521(a)(6), provides that the Administrator "shall determine the feasibility and desirability" of requiring onboard controls for motor vehicles as a means of controlling hydrocarbon emissions from refueling. It further provides that the Administrator shall require onboard controls by regulation if he finds them to be feasible and desirable. "If the Administrator finds that it is feasible and desirable to employ such

technology he shall, after consultation with the Secretary of Transportation with respect to motor vehicle safety,[6] prescribe, by regulation standards regarding the use of onboard hydrocarbon technology which shall not become effective until the introduction to the model year for which it would be feasible to implement such standards, taking into consideration compliance costs and the restraints of an adequate lead time for design and production." *Id.* The text of section 202(a)(6) does not on its face contain any deadlines or time certain for the Administrator's determination of feasibility and desirability or for the promulgation of any rules requiring onboard controls if he finds them to be feasible.

Plaintiffs contend that the EPA Administrator's decision to require onboard controls is "both a proposal to act pursuant to [s]ection 202(a)(6) of the Act ..., and *effectively* a proposal to let that action satisfy its obligations under [s]ection 112." Supplemental Brief in Support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Answers to Defendants' Motions to Dismiss ("Plaintiffs' Supplemental Brief") at 10. Accordingly, plaintiffs argue that the deadlines set forth in section 112(b)(1)(B) are applicable and EPA had a nondiscretionary duty to take final action within 180 days of its proposal regarding onboard emissions controls.

Defendants disagree with plaintiffs' contentions. First, they argue that they satisfied any purported duty under section 202(a)(6) when the Administrator decided on April 13, 1981 not to require onboard hydrocarbon controls. Second, they aver that assuming *arguendo* that the action on April 13, 1981 did not discharge their duty, section 202(a)(6) does not create a deadline

---

**6.** In compliance with section 202(a)(6), "consultations were held with representatives of DOT's [Department of Transportation] National Highway Traffic Safety Administration (NHTSA) to discuss the potential safety hazards associated with onboard controls," during the development of the proposal. 52 Fed.Reg. 31,202 (1987). "During these discussions, EPA's analysis [ ] was reviewed and the Agency sought NHTSA's review and comment on each of the safety issues identified." *Id.* According to EPA, "there appears to be no obstacle which would prevent the

design and production of safe onboard systems, although additional study may be necessary before final rulemaking action to ensure adequate lead time is available for vehicle design and testing." *Id.* EPA stated further that it would "continue to be responsive to the Congressional mandate by consulting further with DOT on potential safety concerns as new information on probable system designs becomes available," and that "[a] final safety evaluation [would] be made as part of the final rulemaking." *Id.*

for EPA action. Defendants contend that "by its omission of any deadlines or timetables, section 202(2)(6) implicitly leaves the Administrator with broad discretion to decide when and under what circumstances to take action." Defendants' Supplemental Brief at 18.

A careful review of the position of plaintiffs reveals a misguided premise. Plaintiffs insist that because the EPA Administrator's decision concerning onboard control ultimately affects the levels of benzene emissions, "any decision to impose onboard controls under 202(a)(6) is a decision to elect that alternative and effectively to satisfy the Administrator's obligations under [s]ection 112 by imposing this alternate method of control." Plaintiffs' Supplemental Brief at 11–12. In support of this contention, plaintiffs point to the fact that in its Regulatory Agenda published on October 26, 1987 in the *Federal Register,* EPA acknowledged that section 112, as well as section 202(a)(6), applies to its decision to impose onboard controls. 52 Fed.Reg. 40,-844 (1987). What plaintiffs fail to point out, however, is that several other sections of the Act are also cited as legal authority. These sections are 42 U.S.C. § 7525 (motor vehicle and motor vehicle engine compliance testing and certification) and 42 U.S. C. § 7502 (nonattainment plan provisions).

Moreover, it appears to the Court that the dangers associated with benzene emissions were not the sole or primary impetus behind the Administrator's decision to require onboard controls, thus section 112's statutory deadline does not necessarily apply. In its August 19, 1987 notice announcing the requirement of onboard controls, EPA stated the specific reasons for the proposal. The reasons include: (1) "improve[ment of] ambient ozone levels in all areas of the country including those that are currently, or are projected to be, in violation of the National Ambient Air Quality Standard for this pollutant." 52 Fed. Reg. 31,162; (2) "provi[sion of] important ozone-related benefits in areas that are now in compliance with the ambient standard." *id.,* and (3) "protect[ion of] the general public from the risks of cancer due to exposure to *benzene,* a component of gas-

oline vapor, and to evaporated gasoline as a whole." *Id.* (emphasis added). *See also,* 52 Fed.Reg. 31,165 (1987) (emphasis added). ("The principal environmental concerns associated with refueling emissions focus on their contribution to ozone formation in the atmosphere *and* on their direct health effects.")

■ The Court finds that when considering the entire regulatory scheme and the purpose of the Act, it cannot agree with plaintiffs' reading of the Act with regard to the alleged relationship between sections 112(b)(1)(B) and 202(a)(6). Congress clearly did not intend to place the Administrator under any specific time constraints as to its decision regarding onboard controls. Unlike several other provisions of the Act, section 202(a)(6) does not contain a specific deadline for compliance. Congress intended that the Administrator exercise his discretion with regard to the issue of onboard controls. The fact that action taken pursuant to section 202(a)(6) will have some effect on the overall level of benzene emissions does not warrant a different conclusion. "In the absence of a readily ascertainable deadline ... it will be almost impossible to conclude that Congress accords a particular agency action such high priority as to impose upon the agency a 'categorical[ ] mandat[e]' that deprives it of all discretion over the timing of its work." *Sierra Club v. Thomas,* 828 F.2d at 791. Accordingly, since section 202(a)(6) does not involve a nondiscretionary duty on the part of the Administrator to propose, this Court does not have jurisdiction over this portion of plaintiffs' complaint; therefore, the Court grants defendants' November 15, 1984 motion to dismiss as to this issue, and denies plaintiffs' motion for partial summary judgment.

Having determined that defendants have no nondiscretionary duty under section 112(b)(1)(B) of the Act to act on the onboard emissions control proposals within the time frame included in that section, the Court in no way means to suggest that defendants have no duty to act within a reasonable period of time as to that proposal. Defendants have a general duty of

timeliness to comply with the mandates of the Act in general, and section 202(a)(6) in particular.

### III. *Conclusion*

An appropriate order incorporating the conclusions of the Court is attached.

### ORDER

Upon consideration of plaintiffs Natural Resources Defense Council, Inc. and Environmental Defense Fund, Inc.'s motion for [partial] summary judgment ("Plaintiffs' Motion for Partial Summary Judgment"); defendants United States Environmental Protection Agency ("EPA") and the EPA Administrator's motions to dismiss filed respectively on November 15, 1984, and December 21, 1984; the various papers filed either in support of, opposition or reply to the plaintiffs' and defendants' motions; the entire record herein, and for the reasons stated in the accompanying opinion, it is by the Court this 14th day of September 1988,

ORDERED that plaintiffs' motion for partial summary judgment is granted in part and denied in part; it is further

ORDERED that defendants' motion to dismiss filed on November 15, 1984, is granted; it is further

ORDERED that, on or before March 13, 1989, defendants shall publish in the *Federal Register* final determinations pursuant to section 112 of the Clean Air Act, 42 U.S.C. § 7412, on whether or not to regulate emissions of benzene from chemical manufacturing process units, including ethylene plants, chlorobenzene plants, nitrobenzene plants, linear alkyl benzene plants, cyclohexane plants, waste disposal from chemical manufacturing, refinery waste disposal, industrial solvent usage, and other forms of benzene usage; bulk terminals, bulk plants, and service stations (including the filling of service stations tanks by gasoline tank trucks but not including the refueling of motor vehicles at service stations), and shall promulgate such benzene emission standards as are appropriate within 180 days of any emission standards proposed by defendants; and it is further

ORDERED that these cases are dismissed.