BROWN, Circuit Judge,
concurring:
I fully concur with the court’s opinion. I write separately only to note that after setting the President and his administration firmly in their sights, Petitioners all but ignore the NRC — a named party in this suit and the only agency with an existing obligation under the NWPA. “[0]ur jurisdiction ... is not limited to situations in which ‘final action,’ as it is commonly understood, has indeed been taken.” Sierra Club v. Thomas, 828 F.2d 783, 793 (D.C.Cir.1987). “Agency inaction may represent ‘agency recalcitrance ... in the face of a clear statutory duty ... of such magnitude that it amounts to an abdication of statutory responsibility.’ ” Id. (quoting Pub. Citizen Health Research Gr. v. FDA, 740 F.2d 21, 32 (D.C.Cir.1984)) (alterations in original). It is arguable the NRC has abdicated its statutory responsibility under the NWPA. The Commissioner publically said:
The agency budget encompasses the licensing board, so if there is no money for the program, there is no money for licensing activities and for the licensing board itself ... Our overall focus is on closing out our review of the license application, and so that includes the licensing board, it includes everything that is involved in that. If there were unresolved legal questions, they would stay unresolved legal questions.
Steve Tetreault, NRC Chairman Says Yucca Mountain Closeout to Include License Panel Las Vegas Rev. J., Feb. 2, 2011 (quoting Greg Jaczko). But Petitioners simply do not press this agency inaction claim. Despite months of extensive briefing and protracted questioning at oral argument, Petitioners still see only the President and his administration obstructing their path to judicial review. Nietzsche once remarked that “many are stubborn in pursuit of the path they have chosen, few in pursuit of the goal.” Such stubbornness may snatch defeat from the jaws of victory.
KAVANAUGH, Circuit Judge,
concurring:
“No one doubts Congress’s power to create a vast and varied federal bureaucracy. But where, in all this, is the role for oversight by an elected President? The Constitution requires that a President chosen by the entire Nation oversee the execution of the laws.” Free Enterprise Fund v. Public Co. Accounting Oversight Bd., — U.S. -, 130 S.Ct. 3138, 3155-56, 177 L.Ed.2d 706 (2010).
“The President has been given the power to oversee executive officers; he is not limited, as in Harry Truman’s lament, to persuading his unelected subordinates to do what they ought to do without persuasion. In its pursuit of a workable government, Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.” Id. at 3157 (internal quotation marks, citation, and alteration omitted).
Who in the Executive Branch is ultimately responsible and accountable for deciding whether to terminate the project for storing nuclear waste at Yucca Mountain? Under the text of the Constitution, the answer seems simple: the President of the United States. But it is not so simple. This case illustrates the point. Given the importance and bitterness of the underlying dispute over Yucca Mountain, I think it *439 worth exploring how we got here, constitutionally speaking.
I
The Department of Energy and the Nuclear Regulatory Commission are both agencies in the Executive Branch. See 5 U.S.C. § 105; 42 U.S.C. § 7131 (Department of Energy); 42 U.S.C. § 5841 (Nuclear Regulatory Commission). As a result of the Supreme Court’s 1935 decision in Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), there are two kinds of agencies in the Executive Branch: executive agencies and independent agencies. The Secretary of Energy is removable by the President at will, meaning the Department of Energy is an executive agency that the President has authority to direct and supervise. By statute, the Commissioners of the Nuclear Regulatory Commission are removable by the President only for cause, not at will, meaning that the Commission is an independent agency that operates free of presidential direction and supervision.
This case is a mess because the executive agency (the Department of Energy) and the independent agency (the Nuclear Regulatory Commission) have overlapping statutory responsibilities with respect to the Yucca Mountain project. In particular, both agencies have critical roles in interpreting the relevant statutes and in exercising discretion under those laws. Of importance here, the statutes give the independent Nuclear Regulatory Commission the final word in the Executive Branch on whether the Executive Branch may terminate the Yucca Mountain project. At the President’s direction, the Department of Energy decided to withdraw the Yucca Mountain license application and terminate the Yucca Mountain nuclear storage project. A board within the Nuclear Regulatory Commission preliminarily rejected the decision of the Department of Energy (and thus of the President) to withdraw the Yucca Mountain license application. But the full Nuclear Regulatory Commission has yet to decide whether it will approve or reject the decision of the Department of Energy. Because the Commission has not yet acted on the Department of Energy’s request, the Court’s opinion today properly holds this case unripe under the existing legal framework.
Taking a step back and reading the Constitution, however, it seems odd that the Nuclear Regulatory Commission has the final word within the Executive Branch on this important issue. One would think that the President of the United States controls the Executive Branch and would be able to direct the interpretation of law and exercise of discretion by all agencies in the Executive Branch. See U.S. Const. art. II. The first 15 words of Article II state quite plainly that “[t]he executive Power shall be vested in a President of the United States of America” — not some of the executive power, but all of it. And Article II later says that the President alone has the authority and responsibility to “take Care that the Laws be faithfully executed.” As Professor Amar has summarized, “What Article II did make emphatically clear from start to finish was that the president would be personally responsible for his branch.” Akhil Reed Amar, America’s Constitution: A Biography 197 (2005).
The Framers’ decision to give the President responsibility for the executive power and to take care that the laws be faithfully executed was not just about the lines on the Executive Branch organizational chart. The Constitution’s Framers sought a national government that would be more effective than under the Articles of Confederation (especially in maintaining national security, facilitating economic *440 growth, and raising necessary revenue) and a national government that would be more accountable to the people and more protective of liberty than under the rule of King George III. The Framers were particularly cognizant, moreover, of the link between accountability of officials in the Legislative and Executive Branches and individual liberty. The Framers designed our constitutional structure with the idea that unaccountable power is inconsistent with individual liberty. “The Framers created a structure in which ‘a dependence on the people’ would be the ‘primary control on the government.’ ” Free Enterprise Fund v. Public Co. Accounting Oversight Bd., — U.S. -, 130 S.Ct. 3138, 3157, 177 L.Ed.2d 706 (2010) (quoting The Federalist No. 51 (Madison)) (alteration omitted).
The President is dependent on the people for election and re-election, but the officers of agencies in the Executive Branch are not. Presidential control of those agencies thus helps maintain democratic accountability and thereby ensure the people’s liberty. See id.; see also Bond v. United States, — U.S. -, 131 S.Ct. 2355, 2365, 180 L.Ed.2d 269 (2011) (“[T]he dynamic between and among the branches is not the only object of the Constitution’s concern. The structural principles secured by the separation of powers protect the individual as well.”); Clinton v. City of New York, 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring) (“Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.”); Morrison v. Olson, 487 U.S. 654, 727, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting) (“The purpose of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom.”).
Reading only the text of Article II, one would assume that the Nuclear Regulatory Commission would report to the President, not the President to the Nuclear Regulatory Commission. If two agencies in the Executive Branch were not on the same page (as may happen in this case if the Nuclear Regulatory Commission rejects the Department of Energy’s withdrawal application), the President presumably would have the authority to resolve that disagreement. If an agency were departing from the President’s preferred course (as the Nuclear Regulatory Commission may do), the President presumably would have the authority to prevent that. And if an agency were taking too long to make a critical legal or policy decision (as appears to be the case with the Nuclear Regulatory Commission), the President presumably would have the authority to fix that as well.
But that conception of the constitutional chain of command turns out to be inaccurate with respect to independent agencies such as the Nuclear Regulatory Commission — a consequence of the Supreme Court’s 1935 decision in Humphrey’s Executor. In that case, the Supreme Court, over the strenuous objection of President Franklin Roosevelt, upheld the constitutionality of independent agencies — that is, agencies whose heads are removable by the President only for cause, not at will, and that thus operate free of presidential direction and supervision.
President Roosevelt wanted to direct and supervise the Federal Trade Commission in the exercise of its statutorily assigned duties and discretion. In 1933, shortly after taking office, he therefore fired Commissioner William Humphrey, who disagreed with the President’s views on antitrust and competition issues. Humphrey sued, arguing that under the FTC *441 statute he could be removed only for cause, not at will, and that policy disagreement did not constitute a sufficient basis to be removed for cause. For his part, the President argued that he must be able to remove subordinate executive officers at will in order to exercise the executive power and take care that the laws be faithfully executed. He contended that the statutory restriction on removing Humphrey was unconstitutional under Article II of the Constitution and the Court’s landmark decision nine years earlier in Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). In Myers, Chief Justice and former President Taft wrote a lengthy opinion for the Court holding that the President possessed the constitutional authority to cause the removal of subordinate officers in the Executive Branch.
Notwithstanding the text of Article II and Myers, the Supreme Court in Humphrey’s Executor sided with Humphrey and ruled that President Roosevelt acted illegally when he fired Humphrey. The Humphrey’s Executor Court determined that the President’s “simple disagreement with the [independent agency’s] policies or priorities” did not “constitute ‘good cause’ for ... removal.” Free Enterprise, 130 S.Ct. at 3157.
Humphrey’s Executor thus approved the creation of “independent” agencies— independent, that is, from presidential control and thus from democratic accountability. See Humphrey’s Executor, 295 U.S. at 628, 55 S.Ct. 869 (independent agencies “cannot in any proper sense be charaeterized as an arm or an eye of the executive”); Buckley v. Valeo, 424 U.S. 1, 133, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (“The Court in [Humphrey’s Executor] carefully emphasized that ... the members of such agencies were to be independent of the Executive in their day-to-day operations....”); see also Freytag v. Comm’r of Internal Revenue, 501 U.S. 868, 916, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring in part) (“independent regulatory agencies” are “specifically designed not to have the quality ... of being subject to the exercise of political oversight and sharing the President’s accountability to the people”) (internal quotation marks and alteration omitted); Mistretta v. United States, 488 U.S. 361, 411, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (statutory provisions restricting presidential removal of agency heads are “specifically crafted to prevent the President from exercising ‘coercive influence’ over independent agencies”).[1]
Humphrey’s Executor is perhaps best explained by the fact that it was decided in 1935 on what became known as Roosevelt’s “Black Monday.” It was one in a line of decisions issued in 1935 and 1936 — including two others on the same day as Humphrey’s Executor — by a Supreme Court seemingly bent on resisting President Roosevelt and his New Deal policies. See Geoffrey P. Miller, Independent Agencies, 1986 Sup.Ct. Rev. 41, 93 (“Humphrey’s Executor, as commentators have noted, is one of the more egregious opinions to be found on pages of the United States Supreme Court Reports.”). The other cases in that *442 line have long since been discarded as relics of an overly activist anti-New Deal Supreme Court. See Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (backing away from prior opinions that had expanded non-delegation doctrine); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (backing away from prior cases that had narrowly interpreted Commerce Clause); see also West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (backing away from prior decisions that had aggressively used substantive due process doctrine to overturn state legislation).
But Humphrey’s Executor survived. And it lives on.
II
Because of Humphrey’s Executor, the President cannot remove an independent agency’s officers when the agency pursues policies or makes decisions the President disagrees with. Because the power to remove is the power to control, the President lacks control over an independent agency — that is, the President lacks the power to direct or supervise an agency such as the Nuclear Regulatory Commission. To be sure, the President has power to cajole. The President also has the power to periodically appoint independent agency heads when the terms of old independent agency heads expire. But the President’s power to cajole or to appoint — when not accompanied by the power to remove — is not the power to direct, supervise, or control, as a President or one who has worked for a President could readily explain. As the Supreme Court has stated: “Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.” Bowsher v. Synar, 478 U.S. 714, 726, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); see also Elena Kagan, Presidential Administration, 114 Harv. L.Rev. 2245, 2308-09 (2001) (“When the independents were involved, [the President] acted not as the commander, but as a simple petitioner of the administrative state. Any other approach often would have proved futile (and therefore embarrassing): [The President], after all, had appointed only a subset of the commissioners, could remove none of them, and lacked any claim recognized in either the legal or the political sphere to their submission.”).
Because of Humphrey’s Executor, the President to this day lacks day-to-day control over large swaths of regulatory policy and enforcement in the Executive Branch — from communications regulation (the FCC) to labor regulation (the NLRB) to securities regulation (the SEC) to nuclear power regulation (the Nuclear Regulatory Commission). Those and many other independent agencies have huge policy-making and enforcement authority and greatly affect the lives and liberties of the American people. Yet those independent agencies are democratically unaccountable — neither elected by the people nor supervised in their day-to-day activities by the elected President.[2]
*443 This case is a good example of the continuing significance of Humphrey’s Executor and the independent agency structure it endorsed. Interpreting the relevant nuclear waste statutes, the President of the United States has decided not to use Yucca Mountain as a repository for nuclear waste. As a candidate, the President campaigned on this issue. See, e.g., Scott Conroy, Obama’s Nevada Ad Hits McCain on Yucca Mountain, CBS News (Aug. 9, 2008). And as President, he has followed through on that commitment. See, e.g., Department of Energy, FY 2011 Congressional Budget Request, Budget Highlights 8 (Feb. 2010) (J.A. 688-89) (“The Administration has determined that developing a repository at Yucca Mountain, Nevada, is not a workable option and has decided to terminate” work on the Yucca Mountain project); Statement of Carol Browner, Director of White House Office of Energy and Climate Change Policy, at News Conference Announcing Blue Ribbon Commission on America’s Nuclear Future (Jan. 29, 2010) (J.A. Addendum 177) (“As the President has said many times, we’re done with Yucca.... [W]e work for the President, we take our directions from the President, the President has been clear that Yucca Mountain was not an option.”).
Whether the President’s Yucca Mountain decision, as implemented by his subordinates in the Department of Energy, is in fact consistent with federal statutory law is a hotly disputed question. If it is not consistent with the statutory law, the courts could so rule in an appropriate case. Cf, e.g., Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 728 (2006); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). But that’s not the question at issue here because the President turns out not to have the final word in the Executive Branch on that issue. He is powerless to direct or supervise the Nuclear Regulatory Commission, which is the independent agency charged with determining whether the Executive Branch may terminate the Yucca project. If the Commission rejects the President’s policy decision and legal interpretation— by rejecting the pending application by the Department of Energy (the President’s subordinate) to withdraw the licensing application for Yucca Mountain — then the President may be forced to continue with the Yucca Mountain project simply because the Nuclear Regulatory Commission has told him so.[3]
*444 In its recent Free Enterprise decision, the Supreme Court recognized the constitutional and practical issues that continue to result from the Humphrey’s Executor structure. Free Enterprise Fund v. Public Co. Accounting Oversight Bd., — U.S. -, 130 S.Ct. 3138, 3155-59, 177 L.Ed.2d 706 (2010); see also FCC v. Fox Television Stations, Inc., — U.S. -, 129 S.Ct. 1800, 1816-17, 173 L.Ed.2d 738 (2009); id. at 1825-26 (Stevens, J., dissenting); id. at 1829-30 (Breyer, J., dissenting). In Free Enterprise, the Supreme Court drew an important constitutional line by refusing to extend Humphrey’s Executor so far as to allow two levels of for-cause removal — an independent agency appointed by another independent agency. See Free Enterprise, 130 S.Ct. 3138.[4]
In so doing, the Free Enterprise Court repeatedly emphasized the central role of the President under Article II and the importance of that role to a government that remains accountable to the people. The Court’s rhetoric and reasoning are notably in tension with Humphrey’s Executor — and, indeed, in tension with the Nuclear Regulatory Commission’s having the final word in the Executive Branch on this Yucca Mountain issue:
• “Article II confers on the President the general administrative control of those executing the laws. It is his responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman’s famous phrase. As we explained in Myers, the President therefore must have some power of removing those for whom he can not continue to be responsible.” 130 S.Ct. at 3152 (internal quotation marks and citation omitted).
• “The people do not vote for the Officers of the United States. They instead look to the President to guide the assistants or deputies subject to his superintendence. Without a clear and effective chain of command, the public cannot determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall. That is why the Framers sought to ensure that those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.” Id. at 3155 (internal quotation marks, citations, and alteration omitted).
• Granting an agency “executive power without the Executive’s oversight ... subverts the President’s ability to ensure that the laws are faithfully executed — as well as the public’s ability to pass judgment on his efforts.” That result is “incompatible with the Constitution’s separation of powers.” Id.
• “No one doubts Congress’s power to create a vast and varied federal bureaucracy. But where, in all this, is the role for oversight by an elected President? The Constitution requires that a President chosen by the entire *445 Nation oversee the execution of the laws.” Id. at 3155-56.
• “One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts. Our Constitution was adopted to enable the people to govern themselves, through their elected leaders. The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive’s control, and thus from that of the people.” Id. at 3156.
• “[T]he dissent dismisses the importance of removal as a tool of supervision, concluding that the President’s power to get something done more often depends on who controls the agency’s budget requests and funding, the relationships between one agency or department and another, purely political factors (including Congress’ ability to assert influence), and indeed whether particular unelected officials support or resist the President’s policies. The Framers did not rest our liberties on such bureaucratic minutiae.” Id. (internal quotation marks, citation, and alteration omitted).
• “The Framers created a structure in which a dependence on the people would be the primary control on the government. That dependence is maintained, not just by parchment barriers, but by letting ambition counteract ambition, giving each branch the necessary constitutional means, and personal motives, to resist encroachments of the others. A key constitutional means vested in the President — perhaps the key means — was the power of appointing, overseeing, and controlling those who execute the laws.” Id. at 3157 (internal quotation marks, citations, and alterations omitted).
• “The President has been given the power to oversee executive officers; he is not limited, as in Harry Truman’s lament, to persuading his unelected subordinates to do what they ought to do without persuasion. In its pursuit of a workable government, Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.” Id. (internal quotation marks, citation, and alteration omitted).
• Even “[bjroad power” over an independent agency’s functions — for example, with respect to approving the agency’s budget — “is not equivalent to the power to remove” agency heads. “[Altering the budget or powers of an agency as a whole is a problematic way to control an inferior officer. The [supervisor] cannot wield a free hand to supervise individual [officers] if it must destroy the [agency] in order to fix it.” Id. at 3158-59.
• “The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else. Such diffusion of authority would greatly diminish the intended and necessary responsibility of the chief magistrate himself.” Id. at 3164 (internal quotation marks and citation omitted).
The Court’s various statements in Free Enterprise may be of great significance— as Justice Breyer seemed to suggest in *446 issuing a strongly worded dissent in Free Enterprise and in reading it at length from the bench. To be sure, the Free Enterprise Court said that it was not reconsidering Humphrey’s Executor because the double for-cause removal question presented in Free Enterprise was “far more modest.” Id. at 3157. But there can be little doubt that the Free Enterprise Court’s wording and reasoning are in tension with Humphrey’s Executor and are more in line with Chief Justice Taft’s majority opinion in Myers[5]
In addition to Free Enterprise, another recent development has prompted greater attention to the Humphrey’s Executor independent agency structure: the uneven effectiveness of some of those agencies. For example, the financial crisis of 2008 obviously caused widespread hardship, and some say that several independent agencies were in part responsible for the collapse. When one presidential candidate in 2008 contended in the midst of the crisis that the President should fire the chairman of the SEC, many responded — with apparent justification, given Humphrey’s Executor — that the President had no such power under current law. See, e.g., Jeff Mason, McCain Says He Would Fire Republican SEC Chief Cox, Reuters (Sept. 18, 2008). As that episode showed, in the Humphrey’s Executor- style Executive Branch, the buck doesn’t always stop with the President. Cf. The Federalist No. 70 (Hamilton) (“A feeble executive implies a feeble execution of the government. A feeble execution is but another phrase for a bad execution; and a government ill executed, whatever it may be in theory, must be, in practice, a bad government.”).
Ill
All of that said, Humphrey’s Executor is an entrenched Supreme Court precedent, protected by stare decisis. The point of explaining its history and continuing repercussions here is not to suggest that the case should be overturned. But the fact that courts do and must accept the Humphrey’s Executor precedent does not require ignoring the issues of accountability, liberty, and government effectiveness raised by independent agencies.
Various proposals have been advanced to enhance the accountability and effectiveness of independent agencies in a manner consistent with Humphrey’s Executor.
For example, writing for four Justices, Justice Breyer recently suggested that judicial review under the Administrative Procedure Act’s arbitrary and capricious standard perhaps should be more intensive when courts review actions of independent agencies. Justice Breyer noted that the independent agency’s “comparative free *447 dom from ballot-box control makes it all the more important that courts review its decisionmaking to assure compliance with applicable provisions of the law — including law requiring that major policy decisions be based upon articulable reasons.” FCC v. Fox Television Stations, Inc., — U.S. -, 129 S.Ct. 1800, 1829-30, 173 L.Ed.2d 738 (2009) (Breyer, J., dissenting). Justice Scalia, writing for four Justices, disagreed with that suggestion, arguing that there was “no reason to magnify the separation-of-powers dilemma posed by the Headless Fourth Branch by letting Article III judges — like jackals stealing the lion’s kill — expropriate some of the power that Congress has wrested from the unitary Executive.” Id. at 1817 (citation omitted). Of course, Justice Scalia has previously expressed severe criticism of Humphrey’s Executor. See Morrison v. Olson, 487 U.S. 654, 725-27, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). So his point in Fox seemed to be that he would prefer overruling Humphrey’s Executor to the half-a-loaf approach articulated by Justice Breyer.[6]
Others have suggested, given the Article II backdrop, that an agency may be considered independent rather than executive only if Congress has expressly said as much, by placing for-cause limits on removal of the agency head. Indeed, Justice Breyer raised this issue in the Free Enterprise case. See Transcript of Oral Argument at 18, Free Enterprise Fund v. Public Co. Accounting Oversight Bd., — U.S. -, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (No. 08-861) (“The SEC. What ... restrictions? Because, interestingly enough, my law clerks have been unable to find any statutory provision that says that the President of the United States can remove an SEC commissioner only for cause.... It’s silent.”); see also Free Enterprise, 130 S.Ct. at 3182-84 (Breyer, J., dissenting). For example, the FCC and the SEC were created in the interim between Myers and Humphrey’s Executor (that is, between 1926 and 1935), and Congress did not include for-cause removal provisions in their governing statutes, no doubt because such provisions were thought to be unconstitutional after Myers. In the wake of Humphrey’s Executor, it nonetheless became customary to treat multi-member commissions created without for-cause removal provisions in the interim between Myers and Humphrey’s Executor as if they were independent. But Congress never went back and actually made the SEC and FCC Commissioners removable only for cause.[7]
Moreover, as President Roosevelt suggested in the wake of Humphrey’s Executor itself, Congress and the President remain free to craft legislation that would increase the accountability of these agencies by making the agency heads removable at will — accompanied, if Congress chooses, by more tightly drawn substantive statutes so as to prevent excessive delegations of power to the Executive Branch or perceived concentration of pow *448 er in the President. Humphrey’s Executor holds only that independent agencies are constitutionally permissible, not that such agencies are constitutionally required. The political branches have their own authority and responsibility to interpret the Constitution in a situation like this and, in any event, are able as a policy matter to ensure that agencies are accountable to the people and run efficiently and effectively. Cf. Presidential Memorandum on Government Reform for Competitiveness and Innovation, 76 Fed.Reg. 14,273 (Mar. 11, 2011); The President’s Committee on Administrative Management (“the Brownlow Committee”), Report of the Committee with Studies of Administrative Management in the Federal Government (1937).
I end where I began. This case is a dramatic illustration of the continuing significance and implications of Humphrey’s Executor. As a result of Humphrey’s Executor and the current statutory scheme, the President does not have the final word in the Executive Branch about whether to terminate the Yucca Mountain project. For now, therefore, the ball in this case rests in the Executive Branch not with the President, but rather with the Nuclear Regulatory Commission.

. The question of presidential control over agencies is distinct from the question of the executive power vis-á-vis congressional power: "The unitary executive theory merely means that truly executive power is concentrated in the President; the theory alone does not specify what counts as executive power in the first place.” Neal Kumar Katyal, Hamdan v. Rumsfeld: The Legal Academy Goes to Practice, 120 Harv. L.Rev. 65, 69 n. 16 (2006). For example, one could believe, as Chief Justice Taft and President Roosevelt did, that the President must have the authority to control subordinate officers in the Executive Branch and at the same time could believe that the War Powers Resolution, which limits the President's power to wage war without congressional approval, is constitutional.

. One theory behind making agencies such as the Nuclear Regulatory Commission independent instead of executive was that independent agencies would make only "expert” scientific decisions and that such expert decisions should be made in an apolitical way. But those independent agencies also have to make a slew of non-scientific legal and policy judgments — such as how to interpret governing statutes, how to exercise policy discretion under those statutes, and whom to charge for violations of the law. Those legal and policy decisions generally cannot be resolved simply by scientific formula. Moreover, executive agencies such as EPA and FDA often have to make the same kinds of expert scien *443 tifie decisions as independent agencies, yet those agencies have not been made independent. An agency’s status as an executive agency does not preclude it from developing and operating with customary independence, such as the Attorney General and Solicitor General possess with respect to many decisions. But the President remains accountable for those officers’ decisions. And the President has the legal authority to make the final decisions. There is no doubt, for example, that the Attorney General reports to the President, not the President to the Attorney General. Last Term in Free Enterprise, the Supreme Court noted: "One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts. Our Constitution was adopted to enable the people to govern themselves, through their elected leaders." Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,-U.S.-, 130 S.Ct. 3138, 3156, 177 L.Ed.2d 706 (2010).

. The oddity of the situation is apparent in the Government's brief in this case. The Department of Justice filed a single brief for the Department of Energy and the Nuclear Regulatory Commission. But the brief includes chestnuts such as this: "Because the Commission has not reached a decision on the motion to withdraw [the Yucca Mountain license application], NRC does not join the merits-based arguments set forth in this brief on behalf of DOE....” Gov’t Br. at 7.

. In this case, the issue created by Humphrey’s Executor is that the President's decision on the Yucca Mountain issue is not the final word in the Executive Branch. In other cases, the issue created by Humphrey’s Executor is that it allows Presidents to avoid making important decisions or to avoid taking responsibility for decisions made by independent agencies. When independent agencies make such important decisions, no elected official can be held accountable and the people "cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.' " Free Enterprise, 130 S.Ct. at 3155 (quoting The Federalist No. 70 (Hamilton)).

. Importantly, as Free Enteiprise itself illustrated, Humphrey’s Executor is not necessary to the existence of any particular agency. Rather, Humphrey's Executor affects only the accountability of the agencies and the control the President exercises over them. As Free Enterprise ruled, therefore, the remedy for holding an independent agency unconstitutional under Article II is not to abolish the agency. See 130 S.Ct. at 3161-62. Rather, the remedy is simply to ensure that the agency is more accountable to the people by giving the elected and accountable President greater control over the agency (by making the heads of agencies removable at will, not for cause). Similarly, if President Roosevelt had prevailed in tire Humphrey’s case itself, the Federal Trade Commission would not have disappeared. Rather, the agency simply would have become accountable to the President and thus to the people. Although Humphrey’s Executor is sometimes criticized by those who oppose the size and scope of the modern administrative state, the case is a mistaken target for that criticism. Humphrey’s Executor does not affect the size and scope of the administrative state. Rather, Humphrey’s Executor affects the democratic accountability (or lack thereof) of the independent agencies within the administrative slate.

. Justice Kennedy did not take a position on this issue in Pox.

. There is one post-Humphrey’s case in which the Court suggested that there could be such a thing as an implied independent agency. See Wiener v. United States, 357 U.S. 349, 353-56, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). Assistant Attorney Generad Dellinger for the Office of Legal Counsel later opined that the "rationale of Wiener, which is essentially that Congress must have implied a for-cause removal restriction when the Court believes that the functions of the agency demand such tenure protection, seems questionable.” The Constitutional Separation of Powers Between the President and Congress, 20 Op. Off. Legal Counsel 124, 168 n. 115 (1996) (citation omitted). Whether Wiener applies to the SEC and FCC, for example, is a question that would need to be confronted if Justice Breyer’s inquiry were further pursued.